**LIBERTY MUTUAL INSURANCE COMPANY, Plaintiff,**

v.

**THALLE CONSTRUCTION COMPANY, INC., Defendant.**

**No. 99 CIV. 4994 (WCC).**

United States District Court, S.D. New York.

Oct. 10, 2000.

---

Jaffe and Asher, Attorneys for Plaintiff, New York City, Marshall T. Potashner, of counsel.

Brody, Fabiani & Cohen, for Defendant, New York City, Thomas J. Hall, of counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Liberty Mutual Insurance Company, a Massachusetts corporation, brings this action against defendant Thalle Construction Company, Inc., a New York corporation, alleging a breach of contract based upon defendant's refusal to pay a retrospective premium adjustment under a policy of general commercial liability insurance issued by plaintiff to defendant. Defendant alleges that plaintiff's improper settlement of a claim asserted under the policy constituted a breach of the implied duty of good faith and nonperformance of a condition precedent, thereby excusing defendant's obligations to pay the increased premiums. Plaintiff now moves for summary judgment pursuant to FED. R. CIV. P. 56(b) and defendant cross moves for summary judgment. For the reasons that follow, plaintiff's motion for summary judgment is granted in all respects and defendant's cross motion is denied.

### BACKGROUND

Plaintiff issued defendant a Commercial General Liability Policy, No. TB1–121–034616–029 (the "Policy"), containing a retrospective premium adjustment provision with a loss limitation of $125,000. (Pl. Exs.9(A), 13.) On August 25, 1998, plaintiff conducted an Eighth Retrospective Premium Adjustment. As a result thereof, plaintiff alleges that defendant owes an additional premium in the amount of $122,495, less a credit of $588, for a total of $121,907 plus interest.[1] (*Id.* ¶¶ 11–13.)

---

1. Plaintiff's complaint inadvertently asserted damages in the amount of $122,494, less a credit of $588, for a total of $121,906. However, the parties have stipulated that the audit conducted by plaintiff resulted in an additional premium of $122,495 (Stip. of Agreed Facts ¶¶ 5–6) making the premium adjustment claimed by plaintiff $121,907.

The additional premium is based upon plaintiff's settlement of a claim asserted by Susan McMichael in 1995 for $260,000 (the "McMichael Claim") for damages to her home allegedly caused by defendant. (*Id.* ¶¶ 15–16.)

Defendant claims that its construction activities did not cause damages in the amount of $260,000. It claims that plaintiff conducted an inadequate and careless investigation of the McMichael Claim, resulting in an excessive settlement. (Hall Aff. ¶ 5.) Defendant alleges that plaintiff was careless in that it: (1) lost the claims file and a videotape showing pre-existing damages to the McMichael residence; (2) failed to take statements from any of defendant's employees or to obtain estimates from McMichael concerning the alleged damages; and (3) failed to ensure that the experts retained by plaintiff completed a thorough investigation.

Plaintiff claims that it based its decision to accept the settlement figure of $260,000 upon the advice of its experts and its attorney, Chris Christofides, a principal of the law firm of Jones, Hirsch, Connors & Bull, P.C. ("JHCB"). (Galasso Aff. ¶ 5.) Christofides, who was assigned to the case on May 1, 1998, states that he based his recommendation of settlement upon: expert reports; unavailability of witnesses; videos taken before, during, and after construction; and his own personal experience in construction litigation. (Christofides Aff. ¶ 13.)

## I. *The McMichael Claim*

During the 1980's, defendant contracted with the County of Westchester to perform work for the Outfall Pipeline Project (the "Project"). The Project involved the laying of a culvert from the Mamaroneck Park and treatment facility through the McMichael property. (Christofides Aff. ¶ 4.) In 1988, McMichael granted the County a temporary easement pursuant to which the County had the right to enter the land and bury a portion of the sewer line. (McMichael Complt. ¶ 3.)

In connection with the placement of the sewer line, a vibratory hammer was needed to install steel sheet piles and blasting was required to remove bedrock underneath the water basin adjacent to the McMichael residence. (Christofides Aff. ¶ 5; Notaro Aff. ¶ 7.) The parties in the present action dispute the location of the work in relation to the McMichael house. Plaintiff alleges that the work was performed as close as four feet from the house. (Christofides Aff. ¶ 5.) Defendant alleges that the trench was excavated twenty-five to thirty-five feet from the house itself and the nearest blast occurred approximately thirty to forty feet from the house. (Notaro Aff. ¶¶ 5–7.)

In 1990, McMichael complained of damages caused by defendant during construction. Plaintiff agreed to indemnify and defend the County for claims arising out of the Project based upon defendant's insurance policy as well as its contractual obligations with the County. Thereafter, plaintiff opened a claims file and, on April 24, 1990, retained American Standards Testing Bureau, Inc. ("ASTB") to perform an engineering examination of the McMichael property.

The report, issued on April 30, 1990, stated that defendant's construction efforts were responsible, at least in part, for some damage to the plaintiff's home by aggravating a pre-existing condition and causing the soil to move underneath the deck. (Christofides Aff. ¶¶ 20–22; Ex. 2.) Based upon the ASTB report and its recommendations, plaintiff made a settlement offer of $8,791.34 to McMichael, to which there was no response. For purposes of this suit, defendant estimates that the cost of the repairs listed in the ASTB report amounted to $1,775. (Mirabelli Aff. ¶ 26.)

On August 4, 1995, McMichael filed a complaint against the County for $500,000, claiming that she should be indemnified under the easement agreement due to the damages caused by defendant during the construction. *See McMichael v. County of Westchester,* Index No. 12428/85; (McMichael Complt. ¶ 6). McMichael alleged

that the defendant's conduct caused the concrete foundation of the home to sink three to four inches over a period of several years. McMichael claimed that as a result of the construction, the compacted soil shifted, which in turn caused the piles on which the house was built to sink and shift. (Christofides Aff. ¶ 6.) McMichael also alleged that defendant hit the deck of her house with the bucket of a dredging machine. (Christofides Aff. ¶ 7.) In support of plaintiff's position that its settlement decision was valid, it submits a pre-blast inspection report, conducted by Vibranalysis Seismic Consulting, which does not indicate that the concrete slab foundation had fallen prior to construction. (Potashner Aff. ¶¶ 9–10; Ex. 12.)

## II. *Liberty Mutual's Investigation*

As stated above, defendant alleges that plaintiff's carelessness included losing the original claims file as well as a videotape showing pre-existing damage to the McMichael home. Defendant alleges that this videotape would have mitigated its damages. (Mirabelli Aff. ¶¶ 23, 26.) Plaintiff denies that the videotape was ever given to it. However, plaintiff argues that even if it did have possession of the tape, it would have hurt defendant's position in settling the McMichael Claim. It argues that the tape showed a pre-existing drop of only one inch and offers the testimony of Paul Mirabelli, a corporate administrator employed by defendant since 1989, who admits seeing a one-inch drop. Plaintiff contends that it was the additional two to three-inch drop in the concrete foundation which caused the most significant damage to the McMichael residence. (Potashner Aff. ¶¶ 9–12; Mirabelli Dep. at 30.) Furthermore, Christofides contends that another video taken during the construction showed the house vibrating as a result of the installation of the steel sheet piling. (Christofides Aff. ¶ 37.)

Defendant also argues that plaintiff's claims file does not contain any statements, interviews, or conversations with any of defendant's employees involved in the construction at issue. (Hall Aff. ¶ 25; Exs. 5, 6(K).) Defendant alleges that plaintiff's failure to take statements from persons involved in the work constituted a failure to follow its standard practice and the procedures outlined in its written claims manual.[2] (Hall Aff. ¶¶ 12–27.) In an effort to establish plaintiff's standard practice, defendant submits the deposition testimony of Ricardo Archuleta, plaintiff's claims manager, who testified to the importance of obtaining appraisals and estimates of the alleged property damage. (Hall Aff. ¶ 23; Archuleta Dep. at 56–58.)

## III. *Investigation and Defense Conducted by JHCB*

In response to the McMichael lawsuit, plaintiff retained JHCB. On January 24, 1996, JHCB projected that the case had a settlement value of $20,000 based upon the reports in the file and the projected cost of defense. (Hall Aff. ¶ 29; Ex. 10.) Thereafter, JHCB served interrogatories on McMichael and two notices of discovery and inspection of documents. However, there were no depositions of either McMichael, defendant's employees, or representatives of the County. (Pl. Resp. to Def. Second Notice to Admit ¶¶ 41–45.) The reasons why JHCB did not obtain any statements from defendant's employees is in dispute among the parties. Defendant alleges that during the course of discovery, JHCB failed to obtain a bill of particulars from McMichael as to her claimed damages and was not provided with any estimates, invoices, or proofs of loss to substantiate the property claim until June 1998, one month before the scheduled trial date. (Def. Rule 56.1 Stmt. ¶ 44.)

After the close of discovery, JHCB retained Ronald Frei, an engineer employed by Hudson International Consultants and Engineers, to determine the cause and extent of the damages to the McMichael

---

**2.** The relevant portions of plaintiff's claims handling manual will not be disclosed pursuant to a Confidentiality Stipulation and Protective Order, signed April 26, 2000.

house. Although, as an initial matter, Frei recognized the necessity of obtaining soil borings at the construction site in order to identify the states of compaction and to provide geotechnical information (Pl. Resp. to Def. Second Notice to Admit ¶ 51) it is undisputed that no borings were ever taken by Frei or his representatives. (Stip. of Agreed Facts ¶ 6.) Defendant submits the testimony of Roy Hunt, a consultant retained by Frei in connection with the geotechnical aspects of the case, in support of its claim that the failure to take soil borings close to the home, plus lack of other relevant information, rendered the investigation incomplete. (Hall Aff. ¶ 52; Hunt Dep. at 22, 27.) At an earlier stage, plaintiff had obtained soil borings seven hundred feet from the house. Defendant alleges that these measurements were incapable of giving reliable data. Defendant also submits the affidavit of Robert Alperstein, an engineer retained by defendant in the instant action, who claims he was able to obtain borings twenty-five to fifty feet from the house. (Alperstein Aff. ¶ 5.)

Frei issued two reports dated August 11, 1997 and November 13, 1997. In the August 11, 1997 report, Frei determined that defendant's construction efforts caused damage to McMichael's deck and compacted the soil, but his report did not address the geotechnical behavior that was causing the piles to settle. (Pl.Ex. 3.) On September 17, 1997, Frei performed an on-site visit but was thereafter denied McMichael's permission to enter the property.

On September 29, 1997, Frei concluded that the construction caused the existing soil on the site to drop three inches. He recognized that prior to construction, the garage and crawl space had fallen approximately one inch. Frei concluded that the construction aggravated a pre-existing condition. (Christofides Aff. ¶ 30; Pl.Ex. 6.) Although the November 13, 1997 report stated that settlement had occurred during construction (Pl. Rule 56.1 Stmt. ¶ 27; Pl.

Ex. 4) it indicated that this issue needed to be addressed in the future along with the issues concerning the damage to the deck. (Def. Rule 56.1 Stmt. ¶ 50; Def. Ex. 6.)

On June 22, 1998, McMichael's experts estimated the cost of repairing damage due to the construction to be $340,000. (Def. Rule 56.1 Stmt. ¶ 71.) According to plaintiff, McMichael then claimed that her house had to be torn down and rebuilt. (Christofides Aff. ¶ 32.) In a report dated July 14, 1998, Christofides was informed by Frei that it would cost $158,000 to repair the damage on the McMichael residence. (Christofides Aff. ¶¶ 28–29; Pl.Ex. 5.) However, such a figure was considered by Frei to be "light." (Christofides Aff. ¶ 29.) Defendant disputes whether Frei's estimate relates to all of the damage to the McMichael house or simply that damage that was caused by defendant. (Hall Aff. ¶ 45.) Defendant's expert, Alperstein, contends that defendant's construction did not cause such extensive damage. He concludes that there was a possibility of soil settlement without the installation of the sewer line due to the fact that there was pre-existing settlement. Based upon the ASTB report, Alperstein estimated the damage caused by defendant to be $1,775. (Alperstein Aff. ¶¶ 7–10.)

Christofides asserts that he informed plaintiff that if the case went to trial, they could be subject to a possible verdict of $158,000 based upon Frei's report. (Christofides Aff. ¶ 33.) In a letter written to plaintiff, Christofides concluded that the bucket hit one of the pile caps, thereby breaking the deck. He also concluded that the settlement of the slabs in the crawl space, basement and garage were caused by installation of the sheet piles and advised plaintiff that the claim could be handled "expeditiously and cost effectively" if the demand was reduced to under $300,000. (Christofides Aff. ¶¶ 9–10; Pl.Ex. 1.) Plaintiff increased its reserves to $300,000.[3] Mirabelli was notified of the in-

---

3. The reserves include "the aggregate estimated amounts due or to become due on account of all known losses and claims and loss ex-

penses incurred but not paid, including the estimated liability on any notice received by the company of the occurrence of any event

crease two days later, but the parties dispute whether defendant made any complaint concerning the over-reserved claim.

Christofides submits in his affidavit that on July 13–14, 1998, he was able to negotiate a settlement figure of $260,000 and recommended such settlement to plaintiff. (Christofides Aff. ¶¶ 11–12.) Defendant alleges that it did not receive any phone calls, correspondence, or other communication concerning settlement negotiations or its consent. Defendant asserts that its next communication with plaintiff did not occur until it received a letter from JHCB dated July 14, 1998, informing it of the settlement that had occurred the previous day. (Mirabelli Aff. ¶¶ 19–20.)

## DISCUSSION

### I. *Summary Judgment Standard*

Defendant moves for summary judgment pursuant to FED. R. CIV. P. 56(b). Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party has the initial burden of demonstrating the absence of any genuine issues of material fact. *See Weinstock v. Columbia University*, 224 F.3d 33, 40 (2d Cir.2000). The burden then switches to the non-movant who must demonstrate that genuine issues of material fact exist. *See id.* In deciding whether summary judgment is appropriate, the court must resolves all ambiguities and draw all reasonable inferences in favor of the non-movant. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997). The court's role at this stage of the litigation is not to decide genuine issues of material fact, but to determine whether the record, in its entirety, presents any genuine issues for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Summary judgment may not be granted simply because the court believes the plaintiff will not be able to meet his burden of persuasion at trial. *See Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 54 (2d Cir.1998).

### II. *Liability on Insurance Premiums*

#### A. *Prima Facie Showing of Liability on Insurance Premiums*

 An insurer establishes a prima facie case of liability for insurance premiums on an audited policy by offering evidence: (1) showing that the policy was issued to the insured; and (2) illustrating the computation of the earned premium established through an audit of the insured's books and records after the expiration of the policy period. *See Liberty Mutual Ins. Co. v. Star Indus. Inc.*, No. 96–CV–0644, 1997 WL 1068692, at *3 (E.D.N.Y. Oct.10, 1997); *Liberty Mutual Ins. Co. v. Kings Nissan, Inc.*, No. 93–CV–3560, slip op. at *8 (E.D.N.Y. April 21, 1994) (citing *Family Coatings, Inc. v. Michigan Mutual Ins. Co.*, 170 A.D.2d 816, 566 N.Y.S.2d 106 (App. Div.3d Dep't 1991)). *See also Safeguard Ins. Co. v. E. Tetz & Sons, Inc.*, 271 A.D.2d 516, 706 N.Y.S.2d 351, 351 (2d Dep't 2000); *Federal Ins. Co. v. 603 Warehouse Assoc., Inc.*, 254 A.D.2d 232, 679 N.Y.S.2d 308, 308 (1st Dep't 1998). Once the insurer establishes its prima facie case, the burden shifts to the insured to demonstrate that it did not receive the benefits owed to it under the insurance policy. *See Family Coatings*, 566 N.Y.S.2d at 107.

In this case, defendant does not dispute either the issuance of the Policy or the results of the audit for determining the premium. (Stip. of Agreed Facts ¶¶ 1, 6.) Therefore, plaintiff has established a prima facie case in support of its summary judgment motion. The issue is whether defendant has satisfied its burden by demonstrating that it did not receive the Policy's

which may result in a loss." N.Y. INSURANCE LAW § 4117(b)(1) (McKinney's Supp.2000).

benefits as a result of plaintiff's alleged inadequate investigation and improper settlement of the McMichael Claim.

## B. *Implied Duty of Good Faith and Fair Dealing*

An insurance policy which gives the insurer the right "to make such investigation and such settlement of any claim or suit as it deems expedient," has been held to give "the insurer the unconditioned right to settle the claim without first obtaining the insured's consent." *Feliberty v. Damon,* 72 N.Y.2d 112, 116, 531 N.Y.S.2d 778, 527 N.E.2d 261 (1988). In this case, in connection with property damage claims, the Policy gave the insurer the same right by authorizing it to "investigate and settle any suit at … [its] discretion." (Pl.Ex. 9(A).) *See also Commerce & Ind. Ins. Co. v. North Shore Towers Mgmt., Inc.,* 162 Misc.2d 778, 617 N.Y.S.2d 632, 634 (1994) (noting the parties' concession that the policy provision which gave the insurer the right to "investigate and settle any claim or 'suit' at … [its] discretion" allowed the insurer to settle the without obtaining the insured's consent).

■■■ However, it is well settled New York law that an insurer granted such "exclusive control" over the settlement and defense of claims is subject to an implied duty of good faith and fair dealing in certain contexts. *Pavia v. State Farm Mutual Auto. Ins.,* 82 N.Y.2d 445, 605 N.Y.S.2d 208, 626 N.E.2d 24, 26 (1993). This implied duty of good faith and fair dealing has been applied in situations where an insurer has been presented with a settlement offer that is within the policy limits. *See id.* at 27; *Pinto v. Allstate Ins. Co.,* 221 F.3d 394, 398–99 (2d Cir.2000); *see also Smith v. General Accident Ins. Co.,* 91 N.Y.2d 648, 674 N.Y.S.2d 267, 270, 697 N.E.2d 168 (1998) (holding that an insurer acted in bad faith by failing to keep the insured informed of settlement negotiations); *New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763, 769 (1995) (discussing implied duty of good faith and fair dealing in denying claim coverage). In *Pavia,* the

New York Court of Appeals noted that a settlement offer within policy limits places the interests of the insurer and insured in conflict. *See* 605 N.Y.S.2d 208, 626 N.E.2d. at 27. The insurer desires to limit its payments under the policy, whereas the insured seeks to avoid any liability above the policy limits. *See id.* The "bad-faith" doctrine is a balance of these competing interests. As a consequence, the insured must prove more than ordinary negligence, but does not have to prove that the insurer had a sinister motive in refusing to settle the claim. *See id.*

As defendant correctly notes, this "bad-faith" doctrine has also been extended to those situations in which the insurer settles a claim within policy limits but, in doing so, subjects the insured to liability for a deductible. *See Commerce & Indus. Ins.,* 617 N.Y.S.2d at 634. In this situation, the insurer seeks to avoid the costs of litigation and minimize its liability by settling within the deductible and the insured seeks to pay the least possible amount of the deductible. *See id.*

■■■ However, according to the Appellate Division of the First Department, "New York has never recognized a cause of action or defense for breach of implied covenant of good faith and fair dealing where, as here, it is alleged that an insurer's failure to reasonably investigate claims made against the insured results in an increased retrospective premium." *Insurance Co. of Greater New York v. Glen Haven Residential Health Care Facility,* 253 A.D.2d 378, 676 N.Y.S.2d 176, 177 (1998). *See Commissioners of the State Ins. Fund v. J.D.G.S. Corp.,* 253 A.D.2d 368, 676 N.Y.S.2d 575, 576 (1998); *Hartford Accident and Indem. Co., v. Coastal Dry Dock and Repair Corp.,* 97 A.D.2d 724, 468 N.Y.S.2d 876, 879 (1983); *but cf. Star Indus.,* 1997 WL 1068692, at *5 (considering the burdens of proof associated with the implied duty of good faith and fair dealing in connection with increased retrospective premiums, without explicitly recognizing such cause of action exists). Therefore, under New York law,

policyholders may not defend claims for recovery of retrospective premiums by attacking the investigation, defense, or settlement of an underlying claim. As the First Department held in *Glen Haven*, an insurer's method of conducting its investigation is "a business judgment within its discretion." 676 N.Y.S.2d at 177.

The conflict of interest that is involved when an insurer is presented with a settlement opportunity within policy limits, which is the basis of the "bad-faith" doctrine, does not arise with respect to increased retrospective premiums. In the latter case, the insurer often pays more money than the insured. Thus it is in the insurer's best interest to conduct any investigation and settlement in good faith.

In the instant case, plaintiff insurer spent a total amount of $295,004.13—the settlement amount of $260,000, plus attorneys' fees in the amount of $35,004.13. If the claim had been litigated, plaintiff would have been subject to a possible verdict of $613,800.[4] (Christofides Aff. ¶ 32; Hall Aff. ¶ 77.) However, under the loss limitation of $125,000, the retrospective premiums are based only upon the first $125,000 of any settlement.[5]

In further support of its argument that it did not place its interests above defendant's, plaintiff relies on the testimony of the witness, Mirabelli, whom defendant designated under FED. R. CIV. P. 30(b)(6). Mirabelli testified that plaintiff did not act in bad faith. He conceded that any defect in the investigation was more detrimental to plaintiff than defendant. This was due to the fact that plaintiff paid more in connection with the settlement of the McMichael Claim than defendant and that plaintiff would have had to settle for less than $90,000 in order to save defendant additional premiums. Mirabelli testified that whether plaintiff could have done this was unclear to him. (Mirabelli Dep. at 94–95, 155–56, 159.)

Defendant has not cited, and this Court has not found, any case law decided under New York law that explicitly recognizes a cause of action or a defense based upon a breach of the duty of good faith and fair dealing in connection with increased retrospective premiums. Defendant argues that the First Department does not control the instant case because all cases rejecting an implied duty of good faith involve Worker's Compensation. Defendant has failed to distinguish Worker's Compensation and general liability insurance in the context of retrospective premiums and an implied duty of good faith, other than to point out that Section 92 of the Worker's Compensation Law governs workmen's compensation policies.

Section 92 mandates that Workers' Compensation insurance premiums be paid into the State Insurance Fund ("SIF") in three installments when they fall due, irrespective of whether there was any subsequent adjustment based upon the loss record. *See* N.Y. WORKER'S COMPENSATION LAW § 92 (McKinney's 1994). It controls the SIF[6] and not private insurers. How-

---

4. On August 10, 1998, Sweet Claims Co., an appraisal company retained by JHCB, estimated that it would cost $613,800 to replace the McMichael residence, including removal of the existing structure. (Christofides Aff. ¶ 32; Hall Aff. ¶ 77.)

5. Under paragraph IV of the Final Retrospective Premium Endorsement of the Policy, the retrospective premium is computed as the standard premium multiplied by a factor of .250 plus the ratable incurred loss multiplied by a loss conversion factor of 1.10 and multiplying that sum by a tax and assessment factor of 1.031. The retrospective premium is subject to both the minimum retrospective premium, the amount obtained by multiplying the standard premium by a factor of .350, and the maximum retrospective premium, the amount obtained by multiplying the standard premium by a factor of 1.05. The parties have stipulated that this formula results in a retrospective premium of $122,495, in this case. (Pl.Ex. 13; Stip. of Agreed Facts ¶ 6.)

6. In litigation, the State Insurance Fund functions as a separate entity from the State and is treated as a private insurance company. *See generally* N.Y. WORKER'S COMPENSATION LAW § 76 (McKinney's Practice Commentaries by Martin Markowitz) (stating that the SIF may own or lease real estate, sue or be sued in its own name, and allegations of laches and estoppel may be imputed to it).

ever, section 92 does not provide this Court with any basis for distinguishing between Worker's Compensation policies and general insurance policies in the context of the case at bar. In *Hartford* and *Glen Haven,* the First Department granted summary judgment to the private insurers. Accordingly, we hold that there is no cause of action or defense of the implied duty of good faith when the insured alleges that an inadequate investigation resulted in additional retrospective premiums.

### C. *Failure to Perform Condition Precedent*

Under basic contract principles, the failure of one party to perform a condition precedent excuses the performance of the other party. *See* E. ALLAN FARNSWORTH, CONTRACTS §§ 8.5–.6, .8 (2d ed.1990). Defendant alleges that plaintiff's performance of a good faith investigation and settlement under the Policy is a condition precedent to the defendant's obligation to pay the increased premiums. Defendant argues that the insurer's failure to perform its responsibilities excuses defendant's obligations. Essentially, this is the same argument discussed above. Whether defendant's argument is couched in terms of a condition precedent or implied duty of good faith, the law remains the same. The insured may not assert a defense or cause of action for a breach of duty of good faith on the part of the insurer. For the reasons stated above, *see supra Part* II.(B)., plaintiff's motion for summary judgment is granted and defendant's cross motion for summary judgment is denied.

### CONCLUSION

For the reasons stated above, plaintiff's motion for summary judgment is granted in all respects and defendant's cross motion for summary judgment is denied in all respects. The Clerk of the Court shall enter judgment for plaintiff Liberty Mutual Insurance Company for the retrospective premiums due and owing in the amount of $121,907 plus interest accruing from September 24, 1998.

SO ORDERED.