**FEDERAL INSURANCE CO., Plaintiff,**

v.

**ELF AQUITAINE, INC., PCS Phosphate Co., Inc. f/k/a Texasgulf, Inc., Arkema, Inc. f/k/a M & T Chemicals, Inc. and f/k/a Atochem, Inc., Elf Technologies, Inc., and Arkema Canada, Inc. f/k/a Atochem Canada, Ltd., Defendants.**

No. 05–CV–7829 (CM).

United States District Court, S.D. New York.

Sept. 18, 2007.

---

Gustav Peter Rech, Soffer, Rech & Borg, L.L.P., New York, NY, for plaintiff.

Carl D. Hill, Thomas E. Birsic, Kirkpatrick & Lockhart, Pittsburgh, PA, David Scott Versfelt, Kirkpatrick & Lockhart Preston Gates Ellis, LLP (NYC), New York, NY, Daniel Joseph Doron, Goodwin Procter, LLP(NYC), New York, NY, for Elf Aquitaine, Inc., Arkema Inc., Elf Technologies, Inc., Arkema Canada, Inc., defendants.

Richard Irving Werder, Jr., Quinn Emanuel Urquhart Olive & Hedges (51 Madison Ave), New York, NY, Seth Eric Kramer, Jones Day (NYC), New York, NY, James Richard Daly, Jones Day(Chicago), Chicago, IL, for PCS Phosphate Co., Inc., defendant.

**DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

COLLEEN McMAHON, District Judge.

Plaintiff Federal Insurance Company ("Federal") brings this suit against defendants PCS Phosphate Co. ("PCS"), Elf Aquitaine, Inc. ("Elf"), Elf Technologies, Inc. ("Elf Technologies"), Arkema, Inc. ("Arkema"), and Arkema Canada, Inc. ("Arkema Canada"), seeking $609,898 in retrospective premiums allegedly owed by defendants pursuant to the terms of a Workers Compensation Policy and a General Liability Policy issued by Federal.

Before this court are Federal's motion for summary judgment and PCS's cross-motion for partial summary judgment. While Federal moves for judgment on the totality of premiums owed, PCS moves for an order dismissing Federal's claim for premiums that arose out of the Workers Compensation Policy on the grounds that payments made by Federal under this policy were improper.

For the reasons stated below, both motions are denied.

## I. *Background*

This court notes at the outset that the Amended Complaint in this action is approximately one page in length, and that the numerous briefs submitted in support and in opposition to the instant motions range in length from one to six pages. The court has done its best to make sense of the largely impenetrable record, but this task has proven difficult given that none of the parties included a meaningful factual background in any of their briefs.

Unless otherwise indicated, the following facts are undisputed.

## A. The Insurance Policies

Federal provided insurance coverage to the defendants under Workers Compensation and Employers Liability Policy # 7161–29–99 ("Workers Compensation Policy") and Commercial General Liability Insurance Policy # 3525–74–88 ("General Liability Policy" and, collectively, the "Policies"), both of which covered the period April 30, 1985 to June 17, 1986. (Affidavit of Margaret Klose ("Klose Aff."), Ex. 1.) [1] The Workers Compensation Policy provided coverage for bodily injury by accident and disease. (*Id.* at 3.) The General Liability Policy provided insurance for bodily injury and property damage liability, personal injury and advertising injury liability, and medical expenses. (*Id.* at 2.)

While Federal maintains that it continues to fulfill its obligations under the terms of the Policies. PCS states that it "is not aware of any obligations Plaintiff is obligated to fulfill under the Policies." (PCS's Response to Pl.'s R 56.1 Statement ¶ 4.)

## B. The Retrospective Premium Agreement

The parties also executed a Retrospective Premium Agreement ("Retrospective Agreement"), which outlined the method for calculating the premiums due under the Policies. (Klose Aff. Ex. 2 at 1.) The only copy of the Agreement submitted to the court was signed by Federal on May 15, 1985, but was unsigned by defendants. (*See id.* at 4.)

Pursuant to this Agreement, the retrospective premium for the Policies "shall be the sum of: A. The Basic Premium, B. The Excess Loss Premium and C. The Modified Losses, multiplied by the Fax Multiplier." (*Id.* at 2.) The definitions for each of these terms are included in the Retro-

spective Agreement, but are unnecessary for resolution of the instant motions. The Agreement further indicates that computation of retrospective premiums is an ongoing process: "The Company shall compute the Retrospective Premium based on incurred losses valued as of a date six months after termination of the policy and at twelve month intervals thereafter. Any computation of the Retrospective Premium may be deemed final if mutually agreed to by both [Federal] and the Insured." (*Id.*; *see also* Klose Aff. ¶ 6.)

Last, the Agreement requires that, "If the Retrospective Premium determined by any computation made in accordance with [the formula described above] is greater than the premiums previously paid, the Insured shall pay the excess to [Federal]; if less, [Federal] shall return the difference to the Insured." (Klose Aff., Ex. 2 at 3.)

According to Margaret Klose, Federal's Vice–President, "a retrospective rating plan ... provides a means for the insured to share in the loss experience under the policy. If the insured is able to control and limit the losses filed under the retrospective policy, it can achieve a significant premium reduction. If, however, the losses are greater than anticipated, there is the likelihood that the retrospective premiums due will be greater [than] the standard premium would have been." (Klose Aff. ¶ 4.)

## C. The Disputed Retrospective Premiums

Federal claims that as of September 19, 2006, the amount of retrospective premiums due under the terms of the Agreement is $609,898. (Pl.'s R. 56.1 Statement ¶ 3; Klose Aff. ¶¶ 8–10.) This total amount consists of $367,075 under the

---

**1.** Neither of the Policy declarations submitted to this court have been signed by Federal's authorized representative which, according to

the Policies, renders them invalid. (Klose Aff., Ex. 1 at 1.) However, none of the defendants disputes that the Policies were valid.

General Liability Policy, and $242,823 under the Workers Compensation Policy. (Klose Aff. Ex. 3 at 1.) The payments allegedly owed to Federal relate to the six most recent annual adjustment periods from 2000 through 2005 (the 14th through the 19th adjustment). (Am.Compl.¶ 7.)

In support of this amount, Federal cites approximately 90 pages of insurance documents contained in Exhibits 3–5 to Ms. Klose's affidavit.

Exhibit 3 to the Klose Affidavit, titled the Retrospective Adjustment Summary and Loss History, consists of two pages of tables that purportedly "show[ ] the balance due of $609,898." (Klose Aff. ¶ 9.) The first page includes a table that lists the amounts of retrospective premiums for each policy, during each adjustment period, and states at the bottom of the table, "Total amount due Chubb as of 9/19/06 … $609,898."[2] (*Id.*, Ex. 3 at 1.) The second page contains two tables. The first lists the "current audited standard premium," "current retro premium," "gross A/P or R/P," "total previous adjustments," and "additional or return premiums due," for each of the policies. The bottom line in this table states "Total Due Chubb … ($9,282) R/P." (*Id.* at 2.) The second table lists the "retro premium" owed during each adjustment period and indicates whether the premium is outstanding. (*Id.*) Notably, every one of the retro premiums allegedly owed by defendants is listed either as not outstanding or "n/a." (*Id.*) Nothing in Exhibit 3 explains who drafted these tables or how the numbers that fill these tables were derived.

According to Ms. Klose, Exhibit 4, titled the 14th through 20th Retrospective Adjustment Reports, "set[s] forth the compu-

tation of the balance due." (Klose Aff. ¶ 9.) This exhibit consists of ten pages; each page roughly corresponds to a different adjustment period, for example, the first page is "based on the 14th Adjustment Report," and includes a table that appears to follow the formula for determining retrospective premiums outlined in the Retrospective Agreement, for each policy. (*See id.*, Ex. 4 at 1.) According to this table, the bottom line "retrospective premium" owed by defendants during this period under the Workers Compensation Policy is $875,726. (*Id.*) But according to Exhibit 3, the retrospective premium owed by defendants under the Workers Compensation Policy for this adjustment period is $4,002. (Klose Aff., Ex. 3 at 1.) It is not apparent to this court how the sums in Exhibit 4 are connected to the sums in Exhibit 3.

Ms. Klose states that Exhibit 5, titled the Policy Loss Run, "sets forth the loss valuations as of July 25, 2006 and underlies the computations set forth in Exhibit 4." (Klose Aff. ¶ 9.) The Policy Loss Run consists of 76 pages of tables that identity claims paid by Federal under the Policies, for example, for each Workers Compensation claim, the tables list twenty pieces of information: the claim identification number, accident date, reported date, closing date, settling office, cause of injury, injured body part, how the injury occurred, result of the injury, a narrative of the accident, medical reserves and medical paid, indemnity reserves and indemnity paid, expense reserves and expense paid, total recovery, total reserves, total paid, and total incurred. (*See, e.g., id.*, Ex. 5 at 19.) Each page includes up to seven claims: accordingly, Exhibit 5 includes in-

---

2. Exhibits 3–5 actually address retrospective premiums owed under three insurance policies: the Workers Compensation Policy, the General Liability Policy, and a third policy abbreviated as "AL" in the tables. The par-

ties do not address the AL policy in their briefs, likely because the table indicates that Federal actually owes defendants money under this policy.

formation regarding approximately 400–500 claims. Aside from Ms. Klose's bare assertion that these claim payments underlie the computations in Exhibit 4, Federal again makes no attempt to connect the information in Exhibit 5 to the information in Exhibit 4.

The parties do not dispute that Federal has in fact made payments on the claims listed in Exhibit 5 to the Klose Affidavit. According to Leslie Ferguson, who had primary responsibility for the administration and settlement of asbestosis and silica claims filed against PCS in the state of Texas, the claimant loss history attached to her affidavit accurately "sets forth the amount paid out by Federal … as of May 16, 2006 … [and represents] either loss and/or indemnity payments on behalf of the Defendants pursuant to" the General Liability Policy. (Leslie Ferguson Affidavit ("Ferguson Aff.") ¶¶ 2, 4.) I note, however, that the single exhibit attached to Ms. Ferguson's affidavit contains Federal's "claimant loss history" under the General Liability Policy, followed by a three page table that seems to record either claims or payments for expenses and losses regarding an unnamed insurer and insured. (Id., Ex. 1.) It is unclear what the last three pages of this exhibit are meant to demonstrate or whether they relate in any way to the first six pages. It is similarly unclear if and how this exhibit relates to the Klose exhibits.

### D. Facts Relevant to PCS's Motion

PCS moves for partial summary judgment on the portion of retrospective premiums sought by Federal that are based on payment of workers compensation claims brought against PCS by its employees in North Carolina for hearing loss and asbestosis/silicosis. According to PCS, all of these claims arose in North Carolina, and all involve occupational diseases resulting from exposure to asbestos, excessive noise, or other substances. PCS argues that Federal was not the insurance carrier at the time of any of these claimants' last exposure to these substances. Under North Carolina law, any payments made by Federal on these claims were therefore improper, and Federal's demand for retrospective premiums based on these payments is also improper.

However, both parties agree that there has never been a judicial determination regarding who the insurance carrier was at the time of last exposure. The only evidence in the record on this point is a letter dated June 15, 2006, in which Federal informed PCS that, "Federal does not believe it was the carrier at the time of last exposure on any currently filed claims. It is Federal's position that any liability for these compensation claims is limited to a pro-rata determination based on the relevant time of coverage and exposure, and/or agreements entered into with other carriers reflecting such pro-rata determination." (Declaration of Seth E. Kramer ("Kramer Decl."), Ex. G at 1–2.)

Federal claims that this letter merely represented a negotiating position taken by Federal on PCS's behalf, and PCS is now "mischaracteriz[ing]" Federal's position to support its motion. (Pl.'s Response in Opp. to PCS's Mot. for Summ. J. ¶ 4; see also Affidavit of Vicki Craig ("Craig Aff.") ¶ 5.)

Federal further opposes PCS's motion on the grounds that PCS was at all times aware of the amounts and apportionments of all relevant claim settlements, actively participated as a self-insurer in a number of mediation proceedings that resulted in settlements, received executed copies of the relevant settlement agreements, never objected to Federal's decision to contribute to the settlements, and joined Federal as a co-contributor to at least eleven settlements. (Craig Aff. ¶¶ 4, 6–7; Pl.'s Response in Opp. to PCS's Mot. for Summ. J., Exs. 2–3.)

Although PCS concedes all of the above allegations, the attorneys responsible for representing PCS with regard to the relevant workers compensation claims assert that they "had [no] knowledge of a retrospective agreement with Federal, [and] no representative of Federal ever indicated an intention to assess retrospective premiums against PCS for [Federal's] contributions toward ... the settlements of the workers compensation claims." (Affidavit of S. McKinley Gray, III ("Gray Aff.") ¶ 3.)

### E. Procedural Posture

Federal filed the instant lawsuit in New York State Supreme Court on July 26, 2005. Defendants removed the case to the Southern District of New York on September 7, 2005. The original Complaint sought recovery of $ 305,765 in unpaid retrospective premiums. Federal filed an Amended Complaint on April 5, 2006, which increased the amount of retrospective premiums sought to $729,706. According to Federal, this amount was later reduced to the current $609,898 sum, based on Federal's discussion with counsel for defendants. Defendants neither confirm nor deny that this discussion took place.

Federal's motion for summary judgment and PCS's cross-motion for partial summary judgment were both served on October 20, 2006.

### II. Standard of Review

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom sum-

mary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Whether any disputed issue of fact exists is for the court to determine. *Balderman v. United States Veterans Admin.*, 870 F.2d 57, 60 (2d Cir.1989).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Finally, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant.

### III. Discussion

#### A. Plaintiff Federal's Motion for Summary Judgment is Denied

In support of its motion, Federal argues that, "An insurer establishes a *prima facie*

case of liability for insurance premiums on an audited policy by offering evidence: (1) showing that the policy was issued to the insured; and (2) illustrating the computation of the earned premium established through an audit of the insured's books and records after the expiration of the policy period." *Liberty Mut. Ins. Co. v. Thalle Const. Co., Inc.*, 116 F.Supp.2d 495, 500 (S.D.N.Y.2000).

■ While Federal has satisfied the first prong of this test,[3] it has fallen far short of satisfying the second. Federal relies exclusively on Exhibits 3–5 to the Klose Affidavit to illustrate the required compulations but, as discussed above, Federal has made no attempt to explain how these 90 odd pages of insurance claims and retrospective computations are connected. Federal's moving brief asserts that, "All of the calculations for the period in question . . . are submitted herewith," but never explains how any of the numbers in Exhibit 3 derive from the figures in Exhibit 4, or how Exhibit 4's figures supposedly arise from the numbers in Exhibit 5. (Pl.'s Br. at 3.) This court has tried to tick and tie the numbers itself, but without even a jot of guidance from Federal, the task has proven time consuming and, ultimately, impossible. I thus concur with PCS's assessment that, "Plaintiff has failed to support the calculation of the alleged amount due by taking the losses from each claim comprising the relevant Adjustments, and then applying the formula described in the [Retrospective] Agreement." (PCS's Opp. Br. at 2.)

Furthermore, Federal has failed to identify which of the claims in Exhibit 5 to the Klose Affidavit give rise to the allegedly owed retrospective premiums. The Policy Loss Run appears to contain information

regarding *every* claim made under the Policies, regardless of whether they gave rise to prior adjustments that are not in dispute.

Last, although Ms. Ferguson's affidavit seems to have been submitted to demonstrate that Federal actually made payments for the claims at issue, the exhibit attached to her affidavit is difficult to decipher and applies only to the General Liability Policy, not the Workers Compensation Policy (Ferguson Aff. ¶ 3.) Federal offers no other record—such as journal entries of ledgers—demonstrating that payments were actually made. Again, Federal essentially asks this court to rely on its calculations, without any description or evidence supporting the numbers underlying the calculations.

Indeed, absent any explanation from Federal, the record actually seems to undermine Federal's case for retrospective premiums. For example, Exhibit 3—the exhibit on which Federal relies heavily to demonstrate that it is owed $609,898 by defendants—states, "Total amount due *Chubb* as of 9/19/06 [-] 609,898." (Klose Aff., Ex. 3 at 1) (emphasis added.) Nowhere in Federal's pleadings or briefs does it explain its relationship to Chubb. Furthermore, Exhibit 3 contains a table indicating that every one of the retrospective premiums allegedly owed by defendants is either "[not] outstanding" or "n/a." (*Id.* at 2.)

In sum, Federal claims that it is owed $609,898, and defendants dispute this amount. The record does not clarify this disputed issue of material fact, and Federal's motion for summary judgment is therefore denied.

---

**3.** Although neither party submitted copies of the actual Policies, defendants do not dispute

that the Policies were validly issued. (PCS's Response to Pl.'s R. 56.1 Statement ¶ 1.)

## B. Defendant PCS's Cross–Motion for Partial Summary Judgment is Denied

■ PCS moves for partial summary judgment to dismiss Federal's claims for retrospective insurance premiums under the Workers Compensation Policy on the grounds that all of the payments made by Federal under this policy were improper. Specifically, PCS argues that the loss run data provided by Federal indicates that the Workers Compensation claims at issue in this litigation all arise out of North Carolina, and all involve occupational diseases resulting from exposure to asbestos, excessive noise, or other substances. North Carolina law prescribes that only the insurance carrier at the time of the employee's last exposure to harmful substances, is required to make workers compensation payments. Because Federal only provided coverage during the 1985–1986 time period, it was not the insurer of last exposure for the claims at issue, its payments under the Workers Compensation policy were therefore improper under North Carolina law, and its attempt to recoup retrospective premiums based on these improper payments is inappropriate.

Federal counters that there has never been any judicial determination regarding which insurance company was the insurer at the time of last exposure for the relevant claims. Federal also contends that PCS has waived the right to challenge the resolution of the workers compensation claims at issue because PCS directly participated in the mediation and settlements of these claims, and never objected to payments made by Federal. Last, Federal argues that under New York law, the settlement of a claim under a retrospective premium policy is a business decision left to the insurer and is therefore not subject to challenge by the insured.

Because PCS's motion hinges on its contention that Federal's payments under the Workers Compensation Policy were improper under North Carolina law, the threshold inquiry here is what state law governs that policy.

■ In the absence of an express choice of law provision, New York courts apply a "center of gravity" or "grouping of the contacts" analysis. *Tri–State Employment Servs., Inc. v. Mountbatten Sur. Co., Inc.,* 295 F.3d 256, 260–61 (2d Cir.2002) (citing *In re Allstate Ins. Co.,* 81 N.Y.2d 219, 227, 597 N.Y.S.2d 904, 613 N.E.2d 936 (N.Y.1993)). "[C]ourts may consider a variety of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." *Id.* at 261. In the context of insurance contracts, "New York courts also consider many of the factors enumerated in the Restatement on Conflicts of Laws § 193, including 'the location of the insured risk; the insured's principal place of business; where the policy was issued and delivered; the location of the broker or agent placing the policy; where the premiums were paid; and the insurer's place of business.'" *Schwartz v. Twin City Fire Ins. Co.,* 492 F.Supp.2d 308, 317 (S.D.N.Y.2007) (quoting *Olin Corp. v. Ins. Co. of North America,* 743 F.Supp. 1044, 1049 (S.D.N.Y.1990), *aff'd,* 929 F.2d 62 (2d Cir.1991)); *see also Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.,* 84 N.Y.2d 309, 618 N.Y.S.2d 609, 642 N.E.2d 1065 (1994).

The record regarding these choice of law factors is essentially bare. Nothing in the record indicates the parties' place of contracting, the places of negotiation and performance, the location of the subject matter, where the policy was issued and delivered, or where past premiums have been paid. The Workers Compensation declaration page indicates that Federal is incorporated in New Jersey, Elf Aquitaine,

Inc. is domiciled in Connecticut, and the insurance broker—Corroon & Black—is located in New York. None of these locations weighs in favor of applying North Carolina law. (Klose Aff., Ex. 1 at 3.)

The basis offered by PCS for applying North Carolina law is that, "the principal place of risk under the Workers Compensation Policy is North Carolina." (PCS's Opp. Br. at 3–4.) However, PCS cites no evidence for this so-called fact, and nothing in the record suggests that North Carolina is in fact the principal place of risk. Indeed, a quick review of the policy loss run supplied by Federal demonstrates that the various Workers Compensation Policy claimants hail from twenty-five different states. (Klose Aff., Ex. 5.) *O'Neill v. Yield House Inc.*, 964 F.Supp. 806, 810 (S.D.N.Y. 1997) ("The location of the risk will have less significance ... where the policy covers a group of risks that are scattered throughout two or more states.") (internal quotation marks and citations omitted.) Even if the majority of these claimants come from North Carolina, that would not necessarily be evidence that North Carolina was the principal place of *risk*—it would only be evidence that North Carolina was the principal place of claimed injury.

In short, PCS has not convinced this court that North Carolina law should apply to the Workers Compensation Policy. Because PCS has not cited any other potentially applicable state law that prohibits payments from insurers who were not the carrier at the time of last exposure, its motion for partial summary judgment must be denied.

Even if North Carolina law did apply to the Workers Compensation Policy, PCS would have still failed to meet its burden on a motion for summary judgment. On the crucial question regarding whether Federal was the insurer at the time of the claimants' last exposure, the record is slim and the facts are in dispute. The only evidence is a letter dated June 15, 2006, in which Federal informed PCS that, "Federal does not believe it was the carrier at the time of last exposure on any currently filed claims. It is Federal's position that any liability for these compensation claims is limited to a pro-rata determination based on the relevant time of coverage and exposure, and/or agreements entered into with other carriers reflecting such pro-rata determination." (Kramer Decl. Ex. G at 1–2.)

Federal, however, claims that this letter merely represented a "position in negotiating settlements" on behalf of PCS, and that PCS is now "mischaracteriz[ing]" Federal's position. (Pl.'s Response in Opp. to PCS's Mot. for Summ. J. ¶ 4; *see also* Craig Aff. ¶ 5.)

This material fact is thus in dispute, and PCS has done nothing to prove that its position is the correct one. Although PCS could have submitted an evidentiary record indicating which insurance company was the carrier at the time of last exposure, PCS chose not to do so. Viewing the thin evidence submitted by PCS "in the light most favorable to" Federal and drawing "all reasonable inferences in [Federal's] favor," this court cannot determine whether Federal was the carrier at the time of last exposure. *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587, 106 S.Ct. 1348.

Because PCS has failed to demonstrate both that North Carolina law applies to the Workers Compensation Policy, and that Federal was not the insurance carrier at the time of last exposure, it is unnecessary for this court to opine on whether PCS waived its right to challenge payments made by Federal under that policy. But I note that it is somewhat disingenuous for PCS to cite the June 15 letter as evidence that Federal was not the insur-

ance carrier at the time of last exposure (and that Federal's payments and subsequent demand for retrospective premiums were thus improper), given that the same letter plainly indicates Federal's intention to bear a pro-rated share of liability for these claims. (Kramer Decl., Ex. G at 1–2.) Although the record is often opaque, one crystal clear fact that emerges is that the premiums PCS seeks to dismiss arose from insurance claims that were mediated, settled and paid by Federal on PCS's behalf, with PCS's full knowledge. (*See, e.g.,* Pl.'s Response to PCS's Mot. for Summ. J., Ex. 3; PCS's Response to Pl.'s R. 56.1, Statement ¶¶ 2–6.) For PCS now to argue that Federal's payments were improper and that PCS never expected Federal to actually charge retrospective premiums based on these known payments (Gray Aff. ¶ 3), strikes this court as highly implausible.

## IV. *Conclusion*

For the foregoing reasons, Federal's motion for summary judgment and PCS's motion for partial summary judgment are denied.

The parties have thirty days to prepare and file a pre-trial order and all other papers required by my ready-for-trial rules. The date will not be extended. In addition, the parties are directed to fully brief the choice of law issue in their trial briefs.

This constitutes the decision and order of the court.