SEA TOW SERVICES INTERNATIONAL, INC., Plaintiff,

v.

ST. PAUL FIRE & MARINE INSURANCE COMPANY, a Minnesota Corporation, Defendant.

09-CV-5016 (PKC)(GRB)

United States District Court, E.D. New York.

Signed September 29, 2016

---

Steven Altman, Altman & Company, New York, NY, Bradley R. Slenn, Mitchell A. Stein, Stein Law, P.C., Erik B Zarkowsky, Law Offices of Erik B. Zarkowsky, Northport, NY, for Plaintiff.

Andrew M. Premisler, Courtney Alexandropoulos Lanzalotto, Jeremy M. Sokop, Stephen M. Lazare, Lazare, Potter & Giacovas, L.L.P., New York, NY, for Defendants.

## MEMORANDUM & ORDER

PAMELA K. CHEN, United States District Judge:

Sea Tow Services International ("STSI") is a franchise-based marine assistance, towing, and salvage provider with over 90 franchisees nationwide. In March 2007, STSI was sued along with its Miami franchisee, Triplecheck, Inc. ("Triplecheck"), by a Triplecheck employee who sustained severe injuries in a work-related boating accident at Triplecheck's site. At all relevant times, STSI was insured by St. Paul Fire & Marine Insurance Company ("St. Paul"), and Triplecheck was separately insured by a different carrier, RLI Insurance Company ("RLI"). STSI was also covered under Triplecheck's policies with RLI as an "additional insured."

During the underlying personal injury action, St. Paul took the position that RLI's obligation to defend STSI as an "additional insured" under its policies with Triplecheck was primary to St. Paul's own. When RLI disputed this interpretation, however, St. Paul defended STSI with an eye toward later seeking indemnification from RLI for defense and settlement costs. Over STSI's wishes, St. Paul pursued a strategy of unilateral settlement that would release only STSI, instead of a global settlement that would release both STSI and Triplecheck. Before St. Paul could finalize a unilateral settlement, however, STSI went behind its insurer's back and negotiated a global settlement within the combined policy limits available to STSI and Triplecheck. The two insurers paid the settlement amount, and St. Paul subsequently sued and settled with RLI to recover a portion of the settlement and defense costs it incurred in the underlying action.

The instant action followed. Although STSI suffered no out-of-pocket costs in either the underlying personal injury action (which settled within policy limits) or the later coverage dispute between the two insurers (to which STSI was not a party), STSI alleges that St. Paul breached its policy and/or acted in bad faith by taking the settlement and coverage positions it took in the underlying action. STSI additionally asserts causes of action against St. Paul for unfair and deceptive trade practices under New York General Business Law § 349 (Count Two), tortious interference with contracts between STSI and Triplecheck (Count Three), professional malpractice (Count Four), defamation (Count Five), and civil conspiracy (Count Six). St. Paul has moved for summary judgment on all counts. (Dkts. 232, 240.) For the reasons set forth below, the Court GRANTS St. Paul's motion for summary judgment in its entirety and DISMISSES this action.[1]

---

**1.** The Court notes that the parties' submissions include numerous exhibits with "confidential" or "highly confidential" designations that were filed as restricted documents, accessible only to counsel of record and court users. (*See generally* Attachments to Dkt. 237- ("Pl.'s Exs.") and Dkt. 238- (Def.'s Exs.").) Specifically, in an earlier motion requesting the removal of STSI's "confidential" and "highly confidential" designations or alternatively, leave to file documents containing such designations under seal, (Dkt. 214), St. Paul contested STSI's designations of "confidential" or "highly confidential" on the following exhibits to St. Paul's motion for summary judgment: Def.'s Exs. 4, 6, 7, 9, 10, 11, 13, 14, 15, 16, 17, 18, 20, 30, 32, 35, 36, 38, 40, 44, 49, 50, 51, 54, 56, 65, 69, 70, 72, 85, 89 and 94. On November 13, 2015, the Honorable Gary Brown issued an order permitting St. Paul to file these documents under seal.

To the extent the Court cites or quotes from a document that was designated "confidential" or "highly confidential" and filed on a restricted basis by the parties in this Memorandum & Order (the "Decision"), the Court has reviewed the document and determined that the cited or quoted section does not merit restricted access. Out an abundance of caution, however, this Decision will be filed on a

## BACKGROUND [2]

### A. THE PARTIES & RELEVANT AGREEMENTS

#### 1. Franchise Agreement Between STSI And Triplecheck

To become a member of the Sea Tow network, a prospective franchisee must sign a Franchise Agreement for a renewable ten-year term, which defines the specific geographic area in which the franchisee is permitted exclusive use of the Sea Tow name and its intellectual properties. (Frohnhoefer Decl. ¶ 9.[3]) Triplecheck executed a Franchise Agreement with STSI on or about June 23, 2003, after which it was permitted to use the name "Sea Tow Miami." (Dkt. 237–1 ("FA").) The relevant Franchise Agreement provisions for purposes of this dispute are:

- <u>Mandatory Insurance</u>: Triplecheck must purchase insurance coverage and designate STSI as an "additional

---

2. The facts in this section are drawn from the record evidence presented by the parties and the statements contained in the parties' 56.1 submissions, hereafter cited as "Def.'s 56.1" (Dkt. 239) and "Pl.'s 56.1 Opp." (Dkt. 231). Unless otherwise noted, a standalone citation to a 56.1 Statement denotes that this Court has deemed the underlying factual allegation undisputed. The Court observes at the outset that many of STSI's counterstatements fail to cite to evidence that would be admissible, and therefore, do not suffice to put a statement of material fact in dispute. *See* Local Civ. Rule 56.1(d) ("[E]ach statement controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible."); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73–74 (2d Cir. 2001) ("[W]here there are no citations or where the cited materials do not support the factual assertions in the [56.1] Statements, the Court is free to disregard the assertion."). The Court will address specific instances of STSI's failure to controvert facts below where particularly relevant to the case's disposition, but will not do so in every instance for the sake of brevity. Any citations to a party's 56.1 Statement incorporates by reference the documents cited therein. Where relevant, the Court may cite directly to underlying documents.

Citations to "ECF" refer to the pagination generated by the Court's electronic docketing system and not a document's internal pagination.

restricted basis to allow the parties fourteen (14) days to object to any portion of the decision that the party believes should be restricted, *i.e.*, redacted. If no objections are filed within this 14-day period, the Decision will be made public.

3. "Frohnhoefer Decl." refers to the "Declaration of Capt. Joseph J. Frohnhoefer III In Opposition to Motion For Summary Judgment." (Dkt. 237.) The Court notes with extreme disapproval that STSI's "Facts Relevant to Motion" section in its opposition brief contains a single sentence referring the Court to the Frohnhoefer Declaration, which, according to STSI, "is incorporated by reference but, for brevity, is not reprinted herein." (Dkt. 230 ("STSI Opp'n") at ECF 12.) The Frohnhoefer Declaration is an astounding 49 pages, consisting of 124 paragraphs. To incorporate such a document into a brief "by reference" is, in fact, the *very opposite* of brevity; not only is it a wholly improper means of circumventing the 25-page limit (which STSI has already exceeded with 30 pages of argument in its opposition), but such a blunderbuss approach—a theme through all of STSI's submissions—is wholly unhelpful to the Court.

Worse still, the Court notes that the Frohnhoefer Declaration contains far more than just plain recitations of fact; it is replete with characterizations of the evidence, opinion, speculation, and legal arguments and conclusions (from a non-lawyer affiant, no less), none of which has any place in a summary judgment affidavit. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, [and] set out facts that would be admissible in evidence …"). Although the Court is sorely tempted to strike the Frohnhoefer Declaration entirely in light of the sheer number of procedural and substantive improprieties with which it is plagued, the Court will consider those facts of which Frohnhoefer III, STSI's current CEO, had personal knowledge.

named insured." (FA §§ 9.16, 9.16.1; *see also* Frohnhoefer Decl. ¶ 11(a).)

- Indemnification of STSI by Triplecheck: Triplecheck must indemnify STSI "from all losses and expenses ... incurred in connection with any action, suit, proceeding, claim, demand, investigation, or formal or informal inquiry ... or any settlement thereof which arises out of or is based upon ... any acts, errors, or omissions of [Triplecheck] or any of his/her agents, servants, employees, contractors, [etc.] ... at the Approved Location [*i.e.*, Triplecheck's dockage space, *see* FA § 9.1.2] or in any manner in connection with the Sea Tow Franchised Business." (FA § 12.3; *see also* Frohnhoefer Decl. ¶ 11(b).)

- Right of STSI to Assume Defense of Triplecheck: "[STSI] may elect to assume (but under no circumstance is obligated to undertake) the defense and/or settlement of any such action, suit, proceeding, claim, demand, inquiry or·investigation [arising out of Triplecheck's acts, errors, or omissions], provided that [STSI] will seek the advice and counsel of [Triplecheck] and shall keep [Triplecheck] informed with regard to any such proposed or contemplated settlement(s). Such an undertaking by [STSI] shall in no manner or form diminish [Triplecheck's] obligation to indemnify [STSI] and hold it harmless." (FA § 12.3.1; *see also* Frohnhoefer Decl. ¶ 11(d).)

- Indemnification of Triplecheck by STSI: STSI must indemnify Triplecheck "from all losses and expenses ... incurred in connection with any action, ·suit, proceeding, claim demand, investigation, or formal or informal inquiry ... or any settlement thereof which arises out of or is based upon ... any acts, errors or

omissions of [STSI] or any of its agents, servants, employees, contractors, [etc.] ... at the Approved Location [*i.e.*, Triplecheck's dockage space, *see* FA § 9.1.2]." (FA § 12.4; *see also* Frohnhoefer Decl. ¶ 11(c).)

### 2. St. Paul Marine General Liability Policy

At all relevant times, STSI was insured by St. Paul under a Marine General Liability Policy (the "St. Paul MGL Policy"), effective February 25, 2006 to February 25, 2007. (Def.'s 56.1 ¶ 2; Dkt. 237–4 at ECF 40 ("SP MGL").) The St. Paul MGL Policy had limits of $1 million per occurrence, $2 million in the aggregate, and $1 million for defense costs. (Def.'s 56.1 ¶ 2.) Triplecheck was neither a named insured nor an additional insured on the St. Paul MGL Policy. (*Id.* ¶ 3.) In relevant part, the St. Paul MGL Policy provided:

- Insurer's Duty to Defend: "[St. Paul] will pay on behalf of [STSI] all sums which [STSI] shall become legally obligated to pay as damages because of ... 'Bodily Injury' ... to which this insurance applies. [St. Paul] will have the right and duty to defend [STSI] against any claim or 'suit' seeking those damages." (SP MGL § II(A)(1).)

- Insurer's Discretion to Settle: St. Paul "may, at [its] discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result." (SP MGL § II(A)(1).)

- Insured's Duty to Cooperate in Event of Suit: "[STSI] shall cooperate with [St. Paul] and, upon [St. Paul's] request, assist in making settlements, in the conduct of 'suits' and in enforcing any right of contribution or indemnity against any person or organization who may be liable to [STSI] ... [STSI] shall not, except at [its] own cost, voluntarily make any payment,

assume any obligation or incur any expense other than for first-aid to others at the time of the accident." (SP MGL § I(12)(3).)

• Subrogation: "In the event of any payment under this policy, [St. Paul] shall be subrogated to all [of STSI's] right of recovery .... [STSI] shall do nothing after loss to prejudice such rights." (SP MGL § I(15).)

### 3. RLI Marine General Liability Policy & Protection and Indemnity Policy

At all relevant times, Triplecheck was insured by RLI under two different policies: (1) a Protection and Indemnity Policy (the "RLI P&I Policy"), and (2) a Marine General Liability Policy (the "RLI MGL Policy"). (Def.'s 56.1 ¶ 7.) STSI was designated as an "additional insured" under both. (Id.) The RLI P&I Policy had a limit of $1 million and was a "wasting" policy, meaning that its $1 million limit would be eroded by defense costs as they was incurred. (Id. ¶ 8.) The RLI MGL Policy, by contrast, had limits of $2 million in the aggregate, and a separate $1 million for legal fees. (Frohnhoefer Decl. ¶ 33.) According to RLI's interpretation in the underlying action, the RLI MGL Policy excludes coverage for Triplecheck where the alleged loss arises out of a Triplecheck-owned vessel and/or involves injury to a Triplecheck employee. (Def.'s 56.1 ¶ 10.)

### B. UNDERLYING *FERNANDEZ* ACTION

#### 1. Original Complaint (Against Triplecheck Only)

In May 2006, Juan Fernandez, a Triplecheck employee, sued Triplecheck in Flori-da State court ("the *Fernandez* Action") for injuries he sustained when he was struck in the face by a tow hook while on board a Triplecheck-owned vessel in the course of his employment. (Def.'s 56.1 ¶ 9; Frohnhoefer Decl. ¶ 31.) RLI assumed Triplecheck's defense under the RLI P&I Policy and designated Allan R. Kelley of Fowler, White, Burnett, P.A. to serve as defense counsel for Triplecheck. (Def.'s 56.1 ¶ 10; Frohnhoefer Decl. ¶ 31.)

#### 2. Addition of Vicarious Liability Claim Against STSI

In March 2007, nearly one year after the commencement of the original action, Fernandez named STSI as a defendant in its capacity as Triplecheck's franchisor under a theory of vicarious liability. (Def.'s 56.1 ¶ 11.) Shortly thereafter, RLI confirmed to STSI in-house counsel Mitchell Stein, at Stein's request, that RLI's policies covered STSI as an additional insured; RLI noted it was therefore assigning Kelley to represent STSI as well. (Id. ¶¶ 12, 14.) Thereafter, in a May 10, 2007 letter to RLI, STSI, and Triplecheck, Kelley noted that Fernandez's counsel had raised concerns about a possible conflict of interest with RLI's simultaneous representation of Triplecheck and STSI. (Dkt. 237–11, Pl.'s Ex. 10.) In the same letter, Kelley sought confirmation from STSI and Triplecheck that they did not believe there was any conflict of interest with the joint representation at that time, that they agreed to waive any conflict to the extent it existed, and that they reserved the right to retain separate counsel at a later date should a conflict arise.[4] (Id. at ECF 2.) STSI and Triple-

---

4. STSI inexplicably points to this same portion of the May 10 letter as concrete evidence of the existence of a formal "Joint Defense Agreement" ("JDA") between STSI and Triplecheck "to defend the Fernandez Case together, to forego asserting cross-claims against one another ... to seek global settlement within policy limits, and to waive all conflicts of interest." (Frohnhoefer Decl. ¶¶ 36, 37; *see also* STSI Opp'n at ECF 8 n.4.) The Court rejects STSI's characterization of the letter as unsupported by both the plain

check provided such confirmation. (Frohnhoefer Decl. ¶ 37.)

On or about May 14, 2007, St. Paul was notified of the *Fernandez* Action. (Def.'s 56.1 ¶ 16.) In a letter to STSI, dated June 7, 2007, St. Paul stated it was accepting coverage of Fernandez's claim against STSI under its MGL Policy, subject to a reservation of rights.[5] (*Id.* ¶¶ 17-18; *see also* Dkt. 238-14, Def.'s Ex. 14 at ECF 4.) The June 7 letter advised STSI that it was entitled to defense and indemnification under the RLI insurance policy as an additional insured, and that Kelley would continue to serve as the primary counsel for STSI. (Def.'s 56.1 ¶¶ 19, 20.) St. Paul further stated that it was retaining Andy Anderson of Houck Anderson, P.A. (the "Anderson Firm") to monitor Kelley's handling of the case and to evaluate the extent of RLI's obligations to defend STSI under its policies. (*Id.* ¶ 20.) No one at STSI objected or expressed confusion as to St. Paul's confirmation of coverage or as to Anderson's role.[6] (*Id.* ¶¶ 21, 22.)

### 3. Addition of Direct Liability Claim Against STSI

On July 18, 2007, Kelley advised RLI and Stein that there may be a "potential conflict" between Triplecheck and STSI in light of suggestions in the record that Triplecheck purchased the vessel and tow hook in question from STSI. (Def.'s 56.1 ¶ 27; Dkt. 238-18, Def.'s Ex. 18.) Kelley requested that STSI and Triplecheck revisit the issue of joint representation and advise if either of them wanted separate counsel appointed at that time. (*See* Def.'s Ex. 18.) In August 2007, Fernandez amended his complaint a second time to assert a direct liability claim of common law negligence against STSI, alleging that STSI had failed to train him. (Def.'s 56.1 ¶ 28.) At no time following the amendment of the *Fernandez* complaint did St. Paul ever express a view that the St. Paul MGL Policy did *not* cover STSI for the new

---

language of the letter and its context. In any event, the Court concludes below that the existence of a JDA is irrelevant to STSI's claims.

5. It is undisputed that this reservation of rights is not applicable here. (Def.'s 56.1 ¶ 18.)

6. The Court rejects all of STSI's attempts to controvert the June 7, 2007 letter, which border on being frivolous. (*See* Pl.'s 56.1 Opp. ¶¶ 17-22.) For instance, STSI first objects to the June 7, 2007 letter as being "incomprehensible as to St. Paul's position," (*id.* ¶ 17), stating without citation to any record evidence that "[n]o one understood the letter and expressed confusion each time." (*Id.* ¶ 21.) In response to a *direct excerpt* from the June 7 letter in St. Paul's 56.1 Statement, STSI simply states: "Denied. The underlying facts show otherwise." (*Id.* ¶ 20.) Setting aside STSI's lack of citation to any record evidence, the Court finds that the plain language of the June 7 letter that "coverage provided under the [St. Paul] MGL does respond for the allegations for vicarious liability against you" could not be clearer. (Def.'s Ex. 14 at ECF 4.) Next, citing generally to a *232-page* exhibit containing internal correspondence between Anderson and St. Paul's claims manager for the *Fernandez* Action, STSI conclusorily states: "As the evidence shows, [St. Paul] acted in its own self-interest and should have appointed independent counsel, or thereafter simply accepted Mr. Stein as such. Mr. Anderson was already representing [St. Paul] as its coverage counsel and never ceased such representation." (Pl.'s 56.1 Opp. ¶ 19.) These conclusory statements, too, fail to controvert the plain language of the June 7 letter, which make clear that: (1) St. Paul formally accepted coverage of the claim against STSI; (2) its position was that RLI's coverage of the claim was primary to its own; and (3) that Anderson was being retained to further evaluate RLI's duties to STSI. STSI's unsupported objections also fail to controvert St. Paul's 56.1 Statement that STSI did not express confusion as to St. Paul's coverage position. Thus, this Court accepts St. Paul's 56.1 Statements relating to the June 7 letter as undisputed.

direct liability claim.[7] (*Id.* ¶ 29.)

Following the addition of the direct liability claim against STSI, Kelley again expressed concerns about continuing his joint representation of STSI and Triplecheck. (Def.'s 56.1 ¶ 30; Dkt. 238–22, Def.'s Ex. 22 at ECF 7.) On August 28, 2007, Stein sent a letter to RLI agreeing with Kelley's concerns and requesting that RLI appoint Stein and Anderson as STSI's new defense counsel; Stein also sought confirmation that RLI would "continue to provide the indemnity for and fund the defense of [STSI]," citing both the RLI MGL Policy and the Franchise Agreement.[8] (Def.'s 56.1

7. STSI suggests, without evidentiary support, that St. Paul did express such a view and attempts to controvert this statement of fact in its 56.1 Opposition as follows: "Denied. [St. Paul's] conduct and letters sought to place all liability with RLI. (Ex. 49, 55, 56, 62-64, 69, 106)." (Pl.'s 56.1 Opp. ¶ 29.) However, the fact that St. Paul consistently disputed the *order* of coverage between itself and RLI—and therefore, sent numerous letters to RLI taking the position that RLI should be covering STSI's defense obligations in the first instance—does not refute the fact that St. Paul at all times acknowledged that its MGL Policy *also* covered STSI in the *Fernandez* Action. STSI fails to grasp this key distinction, which the Court discusses further at *infra* p. 24.

8. STSI claims that Stein was pressured into signing and sending this letter and repeatedly suggests that STSI would have acted differently had it been aware of the so-called "secret correspondence" taking place between the Anderson Firm and St. Paul's claims manager, Janice McIntyre, during the *Fernandez* Action. (*See* Pl.'s 56.1 Opp. ¶ 32; *see also* Oral Arg. Tr. at 82.) A discussion of this "secret correspondence," of which STSI makes so much, is merited here.

In STSI's words, the record is "replete with secret correspondence between [St. Paul] and [the Anderson Firm], concerning, *inter alia*, [St. Paul] directing counsel to provide policy interpretations and coverage opinions on carrier/policy obligations, case evaluations, settlement offers from Mr. Dorta [Fernandez's counsel], strategies to respond to Mr. Stein, STSI's only true defense counsel, settlement of the claims against STSI's interests, conspiracy to throw the motion for summary judgment before the Florida Court and [St. Paul's] unilateral settlement favoring [St. Paul] against RLI but not STSI. (*See, e.g.*, Exs. 13, 15, 20, 21, 22, 26, 29, 45, 49, 53, 55, 58, 67, 70, 75A, 84, 89, 91, 160)." (STSI Opp'n at ECF 22.) STSI fails to identify or explain which parts of these documents refute any of St. Paul's 56.1 Statements, and the Court has no obligation to sift through an indiscriminate string cite to 19 exhibits—including the 232-page exhibit of internal correspondence contained in STSI's Exhibit 160—in search of facts that could potentially support STSI's theories or liability or place any of St. Paul's 56.1 Statements in dispute. *See Monahan v. N.Y.C. Dep't of Corrections*, 214 F.3d 275, 292 (2d Cir. 2000) ("While the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out.").

The Court has nevertheless taken a look through many of these exhibits and the portions highlighted by STSI. *None* of the highlighted sections this Court has reviewed appear to controvert any of St. Paul's 56.1 Statements. Indeed, the Court finds that the internal correspondence it has reviewed appears entirely *consistent with* St. Paul's openly stated positions on the scope of RLI's coverage and unilateral settlement strategy, of which STSI—and Stein, specifically—was routinely kept apprised. (*See, e.g.*, Def.'s Ex. 16 (July 10, 2007 letter from Anderson to McIntyre, copying Stein, evaluating RLI policies); Def.'s Ex. 17 (July 10, 2007 email from Stein responding to Anderson letter); Def.'s Ex. 21 (August 24, 2007 letter from Anderson to McIntyre and Stein attaching draft letter to RLI); Def.'s Ex. 25 (September 13, 2007 letter from Anderson to McIntyre and Stein); Def.'s Ex. 30 (November 16, 2007 letter from Anderson to Stein and Frohnhoefer); Def.'s Ex. 32 (March 26, 2008 letter from Anderson to McIntyre and Stein on position towards RLI); Def.'s Ex. 33 (Apr. 4, 2008 letter from Anderson to McIntyre and Stein advising as to strategy regarding RLI coverage); Pl.'s Ex. 71 (June 24, 2008 letter from Anderson to Frohnhoefer); Pl.'s Ex. 72 (June 25, 2008 letter from Anderson to Frohnhoefer), Def.'s Ex. 37 (July 7, 2008 letter from Anderson to Frohnhoefer)). Accordingly, the Court finds

¶¶ 31; 32; Def.'s Ex. 22 at ECF 3.) In a letter dated October 3, 2007, RLI took the position that the St. Paul MGL Policy was "a primary insurance contract which should cover the defense costs of [STSI in the. *Fernandez* Action]" and declared that it was therefore "tender[ing] the defense of [STSI] to [St. Paul]." (Def.'s 56.1 ¶ 33; Dkt. 238–28, Def.'s Ex. 28.) As a result of RLI's withdrawal from STSI's defense, St. Paul appointed the Anderson Firm to defend STSI while separately continuing to press RLI on its coverage obligations towards STSI and disputing RLI's position that St. Paul was the primary insurer. (Def.'s 56.1 ¶¶ 34, 36; *see also supra* n.8)

### 4. Settlement Discussions

*Preliminary Discussions.* In March 2008, Fernandez's counsel, Gonzalo Dorta, tentatively offered to settle the *Fernandez* Action with both STSI and Triplecheck for $1.5 million or, in the alternative, to settle with STSI only for $500,000. (Def.'s 56.1 ¶¶ 37, 38.) St. Paul initially took the position that *RLI* should fund any such settlement payment—*i.e.*, that RLI should fund the global settlement for $1.5 million, drawing from both the RLI MGL and P&I Policies, or otherwise use the remainder of the "wasting" RLI P&I Policy to obtain a release of *just* STSI for $500,000. (*See* Dkt. 237–67, Pl.'s Ex. 64.) RLI declined. (*See* Dkt. 237–71, Pl.'s Ex. 68.) Around this time, St. Paul began to explore its rights against RLI to recover portions of a settlement payment in the event St. Paul settled STSI out unilaterally under the St. Paul MGL Policy. (*See* Dkt. 237–70, Pl.'s Ex. 67.) St. Paul also raised the possibility of unilateral settlement with STSI. (*See* Dkt. 238–36, Def.'s Ex. 36 at ECF 2; Dkt. 238–37, Def.'s Ex. 37 at ECF 6.)

In letter dated a July 2, 2008 to Stein, Larry Jacobson of the Anderson Firm sought to address a concern raised by Stein that if STSI were to unilaterally settle out with Fernandez, Triplecheck would later pursue a claim against STSI for failure to train. (Def.'s Ex. 36 at ECF 2.) Jacobson concluded ·that "in the event that [STSI] settles directly with Fernandez, [Triplecheck] is barred from seeking contribution from [STSI] by the General Maritime Law of the United States." (*Id.* at ECF 3.) Around this time, Stein sought a written settlement demand from Fernandez, while noting STSI's desire for a global settlement. (Def.'s 56.1 ¶ 41.) On July 28, 2008, Anderson wrote to STSI urging unilateral settlement in light of "concerns about the evolving nature of the potential claims" that Fernandez might seek to assert against STSI, including claims regarding safety measures on the vessel in question and the tow hook supplied by STSI. (Def.'s 56.1 ¶ 42.)

*First Written Settlement Demand.* On August 14, 2008, Dorta issued his first written settlement demand, seeking $2 million to settle the claims against STSI and separately, $10 million to settle the claims against Triplecheck. (Def.'s 56.1 ¶ 43.) Following a mediation on September 19, 2008, Fernandez reduced his settlement demand to $2.5 million for both companies. (Def.'s 56.1 ¶ 48.) Though Stein and STSI urged St. Paul and RLI to accept the global settlement because it was now within the combined policy limits of St. Paul and RLI, St. Paul was unwilling to pay more than the previous tentatively-offered unilateral settlement demand of $500,000 for the purposes of achieving a global set-

that the existence of "secret correspondence" does not create any factual dispute with respect to St. Paul's 56.1 Statements, and the Court also rejects STSI's attempt to disavow

Stein's actions on account of his ignorance of this correspondence at the time, which the Court finds irrelevant in any event.

tlement.[9] (*See* Dkt. 238–46, Def.'s Ex. 46; Def.'s 56.1 ¶ 49.)

***Second Written Settlement Demand.*** On October 7, 2008, Dorta provided a second written settlement demand to Anderson, extending an offer of $750,000 "as a full and final settlement against [STSI] only" and giving him until close of business on October 9 to accept the offer. (Def.'s 56.1 ¶ 54.) In a letter to Stein and Frohnhoefer on October 8, 2008, Anderson again recommended that STSI accept the demand, in light of the "very strong possibility, even a probability, of a high seven figure (multiple millions of dollars or more) judgment against [STSI]" in the event of trial, for which STSI was inadequately insured. (Def.'s 56.1 ¶ 55.) However, Frohnhoefer reiterated that STSI would only accept a global settlement. (Def.'s 56.1 ¶ 56.)

St. Paul thereafter retained the law firm Hayden Milliken to act as its counsel in connection with the settlement of the *Fernandez* Action. (*Id.*) On October 10, 2008, St. Paul advised STSI of its intent to accept the settlement demand of $750,000 over STSI's continued objection. (*Id.* ¶ 57.) In the same letter, St. Paul reminded STSI that St. Paul had a contractual right to settle any claim or suit at its discretion, that it had no legal obligation toward Triplecheck, and that STSI had a contractual duty to cooperate in St. Paul's settlement efforts, citing to Articles II(A)(1) and (12) of the St. Paul MGL Policy. (Dkt. 238–52, Def.'s Ex. 52.) St. Paul further stated that it intended to pursue reimbursement of the

$750,000 from RLI following settlement, pursuant to STSI's additional insured status under the RLI MGL Policy. (*Id.*) A few days later, Hayden Milliken accepted Dorta's settlement demand, and Anderson apprised STSI of the same. (Def.'s 56.1 ¶ 58.)

***STSI's Global Settlement Efforts.*** Before St. Paul could finalize the settlement with Dorta, however, and without St. Paul's knowledge, STSI—through Stein—proceeded to engage in discussions with Triplecheck, RLI, and Fernandez for a global settlement. (Def.'s 56.1 ¶¶ 61–63.) On October 16, 2008, Stein informed St. Paul that STSI had reached a global settlement with RLI and Dorta within policy limits and directed St. Paul to "stand down" on its own settlement efforts. (*Id.* ¶ 61; Dkt. 238–55, Def.'s Ex. 55.) Stein's email suggested that St. Paul might have to make a "further contribution" to the $750,000 of "less than $100k" to obtain the global resolution. (Def.'s Ex. 55.) The global settlement ultimately totaled $2,225,000, with RLI paying $1.475 million and St. Paul paying $750,000. (Def.'s 56.1 ¶ 64.) RLI's $1.475 million figure represented a settlement of *both* the claims against Triplecheck (out of the RLI P&I Policy) and the vicarious liability claims against STSI (out of the RLI MGL Policy); St. Paul's $750,000 contribution represented a settlement of the *direct* claims against STSI only (out of the St. Paul MGL Policy). (*Id.*) St. Paul disputed this allocation, on the ground that its original settlement agreement of $750,000 with Fernandez

9. As the Court understands the situation, St. Paul would have had to pay more than $500,000 to reach the global settlement because: (1) RLI was defending Triplecheck under the "wasting" RLI P&I Policy, which had about $640,000 left at the time, and (2) RLI was only willing to match any contribution by St. Paul on a dollar-for-dollar basis out of its MGL Policy. (Def.'s 56.1 ¶¶ 50–52; Dkt. 238–48, Def.'s Ex. 48.) Thus, for example, to reach Fernandez's global settlement demand of $2.5 million, St. Paul would have had to contribute $930,000 from its own MGL Policy to get RLI to contribute the same from its MGL Policy ($640,000 from RLI P&I Policy + $930,000 from St. Paul MGL Policy + $930,000 from RLI MGL Policy).

was intended to cover **both** the direct and vicarious liability claims, and not solely the direct liability claims, as would be the case under the global settlement. (Def.'s 56.1 ¶¶ 65-68.)

In December 2008, St. Paul sued RLI in the Southern District of Florida, seeking reimbursement of a portion of the settlement and defense costs that St. Paul incurred in the *Fernandez* action. (Def.'s 56.1 ¶ 74.) RLI counterclaimed for, among other things, reimbursement of the settlement payments it had allocated to STSI in the *Fernandez* Action. (*Id.*) All claims between RLI and St. Paul were eventually settled at no cost to STSI. (*Id.* ¶ 75.)

### C. PROCEDURAL HISTORY

On November 13, 2009, STSI commenced the instant action against St. Paul, alleging breach of contract, "bad faith, unfair and deceptive trade practices," and tortious interference with contract. (Dkt. 1.) STSI subsequently amended the complaint twice. On March 16, 2010, STSI filed a First Amended Complaint (the "FAC"), adding the Anderson Firm and Andy Anderson as defendants and asserting claims of professional malpractice and defamation against them. (Dkt. 3.) The FAC also added a cause of action for civil conspiracy between the Anderson Firm, Anderson, and St. Paul. On July 28, 2010, STSI filed a Second Amended Complaint (the "SAC"). (Dkt. 17.) On October 13, 2010, the Anderson Firm and Andrew Anderson moved to dismiss the SAC for lack of personal jurisdiction. Despite STSI's requests for extensions of time to respond to the motion, it never filed a response. On April 28, 2011, Judge Arthur D. Spatt granted the unopposed motion to dismiss. (Dkt. 34.) St. Paul unsuccessfully sought leave to file motions for summary judgment on three occasions, on July 21, 2011, November 21, 2011, and April 3, 2012, based in part on STSI's failure to produce discovery. (*See* Dkts. 36, 58.)

On April 23, 2013, this case was reassigned to me. In January 2014, STSI moved to amend its Complaint for a *third* time to add, among other things, ten advertising and trademark counts relating to St. Paul's national marketing program. (Dkt. 166.) On August 1, 2014, Magistrate Judge Brown issued a Report and Recommendation denying this motion, which this Court adopted on September 18, 2014. On November 24, 2014, St. Paul again sought leave to file a motion for summary judgment, which this Court deferred until after resolution of pending discovery disputes. (12/18/14 Minute Entry.) On June 2, 2015, the Court set a briefing schedule for this motion. After multiple extensions of various briefing deadlines, the motion was finally fully briefed on February 8, 2016. On June 28, 2016, I heard oral argument.

### DISCUSSION

#### A. LEGAL STANDARD

Summary judgment is proper only where, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 173–74 (2d Cir. 2012). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material within the meaning of Rule 56 where it "might affect the outcome of the suit under the governing law." *Id.* In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judg-

ment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (citation and quotation omitted).

The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the party opposing summary judgment must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548; *see also Anderson*, 477 U.S. at 256–57, 106 S.Ct. 2505. The non-moving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that [their] version of the events is not wholly fanciful." *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998) (collecting cases). "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

## B. ST. PAUL'S DUTY TO STSI (COUNTS ONE AND TWO)

STSI claims that St. Paul breached its insurance policy with STSI and/or acted in bad faith in the *Fernandez* Action by: (1) pursuing a strategy of unilateral settlement that would release STSI only, instead of seeking a global settlement that

would also release Triplecheck, as STSI desired; (2) taking the position that RLI's coverage of STSI as an "additional insured" under the RLI P&I and MGL Policies came first and, accordingly, continuously seeking to shift the defense costs and obligations of the action onto RLI; and (3) appointing defense counsel for STSI who was purportedly conflicted, in that he advised St. Paul in favor of unilateral settlement and seeking "additional insured" coverage from RLI. The Court addresses each ground in turn and concludes that none of them are actionable as a matter of law. Indeed, the Court finds that STSI's theories are premised on fundamental misconceptions of an insurer's duty to its insured.

### 1. Strategy of Unilateral Settlement

■ The St. Paul MGL Policy provides that St. Paul may, "*at [its] discretion ...* settle any claim or 'suit'" against its insured. (SP MGL§ II(A)(1).) Such contractual language has been recognized to give the insurer an "unconditioned right to settle [a] claim or suit without [the insured's] consent."[10] *Feliberty v. Damon*, 72 N.Y.2d 112, 531 N.Y.S.2d 778, 527 N.E.2d 261, 262 (1988) (interpreting language that insurer may settle any claim "as it deems expedient"); *see also Liberty Mut. Ins. Co. v. Thalle Const. Co.*, 116 F.Supp.2d 495, 501 (S.D.N.Y. 2000) (applying *Feliberty* to language that insurer may "settle any suit at ... [its] discretion"); *Commerce & Ind. Ins. Co. v. North Shore Towers Mgmt., Inc.*, 162 Misc.2d 778, 617 N.Y.S.2d 632, 634 (1994) (same); *Hamister v. Liberty*

10. The St. Paul MGL Policy is silent as to choice-of-law, and at oral argument, the parties agreed that Florida and New York law were substantially the same for purposes of breach of contract in the insurance policy context. (Oral Arg. Tr. 5:19-22.) Accordingly, the Court applies New York law. *See Arch Ins.*

*Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (implied consent to use a forum's law is "sufficient to establish the applicable choice of law"); *Photopaint Technologies, LLC v. Smartlens Corp.*, 335 F.3d 152, 160 n.8 (2d Cir. 2003) (same).

*Mut. Ins. Co.*, No. 06–cv–0600, 2008 WL 4365893, at *8 (W.D.N.Y. Sept. 22, 2008) (applying *Feliberty* to language that insurer has "the right to ... settle [any] claim, proceedings or suits."). It is thus patently clear that STSI cannot establish an *express* breach of the St. Paul MGL Policy based on St. Paul's settlement strategy in the *Fernandez* Action. The inquiry does not end there, however. Precisely because insurers "typically exercise complete control over the settlement and defense of claims against their insureds," New York courts have recognized that insurers owe a duty of good faith and fair dealing to their insured when deciding whether to settle a claim. *Pavia v. State Farm Mut. Auto. Ins. Co.*, 82 N.Y.2d 445, 605 N.Y.S.2d 208, 626 N.E.2d 24, 27 (1993); *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). Accordingly, the Court must determine whether St. Paul's pursuit of unilateral settlement (or, framed differently, its refusal to hold out for, or contribute more in order to achieve, a global settlement) rises to the level of bad faith. The Court concludes it does not.

The New York Court of Appeals' seminal decision in *Feliberty* is illustrative of the high bar for establishing bad faith liability. *See also Hugo Boss Fashions, Inc. v. Federal Ins. Co.*, 252 F.3d 608, 624 (2d Cir. 2001) (there exists "a strong presumption in New York against a finding of bad faith liability by an insurer"). In *Feliberty*, the insured was a physician who sued his liability insurer for settling a malpractice action without his knowledge or consent instead of pursuing an appeal. Though the settlement was well within policy limits and the physician suffered no out-of-pocket loss, he argued that the settlement "destroyed his practice and ultimately forced him to leave the area." 72 N.Y.2d at 115, 531 N.Y.S.2d 778, 527 N.E.2d 261. The Court of Appeals acknowledged the insured's interest in protecting his professional reputation and livelihood; however, it concluded simply that settlement without the insured's knowledge or consent was something that the insurer "had the right to do under the policy," and therefore did not amount to bad faith. *Id.* at 116, 531 N.Y.S.2d 778, 527 N.E.2d 261, 262. Thus, *Feliberty* makes clear that an insurer does *not* act in bad faith even where its decision to exercise its contractual right to settle results in disastrous business consequences for the insured.

Rather, New York courts have recognized that an insurer's duty of good faith to an insured in the settlement context arises where there exists an "inherent conflict ... between the insurer's desire to settle the claim for as little as possible, and the insured's desire to avoid personal liability in excess of the policy limits." *Pinto*, 221 F.3d at 399.[11] Thus, "[t]he availability of a cause of action for bad faith signals New York courts' recognition that an insurer has an economic incentive not to settle because allowing a case to go to a jury may result in a verdict for less than the insurer's policy limit," which puts the insured at risk of exposure to personal liability if the verdict ultimately exceeds the policy limit. *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006).

11. The Second Circuit in *Pinto* explained the conflict of interest as follows: "Although an insurance company has a contractual obligation to defend its insured, it also has a contractually defined limit of exposure to plaintiff's suit. An insurer has an economic incentive not to settle, hoping a jury will bring in a verdict for less than the policy limits. But when such hope goes awry, as it did here, the insured is the loser, being personally responsible for the excess. These conflicting interests between the insurer and the insured cause them to rub against each other like unmoored rowboats on a placid pond." 221 F.3d at 396.

The standard for finding bad faith where an insurer declines to accept a settlement offer within policy limits was articulated by the New York Court of Appeals in *Pavia*:

> [T]he plaintiff must establish that the insurer's conduct constituted a *"gross disregard"* of the insured's interests—that is, a *deliberate or reckless failure **to place on equal footing** the interests of its insured with its own interests when considering a settlement offer* .... In other words, a bad-faith plaintiff must establish that the defendant insurer engaged in *a **pattern of behavior evincing a conscious or knowing indifference** to the probability that an insured **would be held personally accountable** for a large judgment if a settlement offer within the policy limits·were not accepted.*

605 N.Y.S.2d 208, 626 N.E.2d at 27–28 (emphasis added). In adopting this "gross disregard" standard, the court sought to strike a balance between the insured's rightful expectation that its insurer act in its interests and the insurer's "equally legitimate" contract expectations. *Id.*, 605 N.Y.S.2d 208, 626 N.E.2d at 28.

Attempting to analogize to *Pavia*, STSI argues that in seeking to enter into a unilateral settlement with Fernandez, St. Paul acted in "gross disregard" of the risk that STSI would have been exposed to significant personal liability from Triplecheck down the road. (STSI Opp'n at ECF 24-25.) STSI's convoluted theory proceeds as follows: First, STSI maintains that had the unilateral settlement succeeded and STSI been released from the *Fernandez* Action, Triplecheck would have been left in the action with only the wasting RLI P&I Policy to draw from.[12] (STSI Opp'n at ECF 17.) Next, STSI contends that because the amount remaining on the RLI P&I Policy—roughly $640,000 at the time of the settlement discussions—would not have been enough for Triplecheck to obtain its own release from the action, Triplecheck would have gone to trial and likely incurred a large judgment. (*Id.*) To mitigate this devastating judgment, the theory continues, Triplecheck would have been forced to assert cross-claims against STSI for indemnification under Article 12 of the Franchise Agreement. (*Id.*) Last but not least, STSI posits that the St. Paul MGL Policy would not have covered this hypothetical cross-claim for indemnification, as it would be considered part of the same "occurrence" as thè *Fernandez* Action, for which STSI inexplicably assumes St. Paul would not have paid again, even though coverage is unexhausted. (*Id.*) In the alternative, STSI posits that Triplecheck could have sued STSI for "breach of the [Franchise Agreement] indemnification clause," which "would be [an] uninsured breach of·contract" under the St. Paul MGL Policy. (*Id.*) Either way, STSI theorizes, it would have been left in the lurch by St. Paul and personally exposed to Triplecheck.

█ While the Court is tempted to pick apart the illogic that permeates this parade of horribles, it need not do so.[13] It is

---

12. The parties do not dispute that throughout the *Fernandez* Action, RLI maintained that the RLI MGL Policy excluded coverage for Triplecheck because the alleged loss arose out of a Triplecheck-owned vessel and/or involved injury to a Triplecheck employee. (Def.'s 56.1 ¶ 10.) Thus, only the RLI P&I Policy was available to Triplecheck for settlement purposes. (*Id.* ¶ 51.)

13. The Court, however, agrees generally with St. Paul's assessment that "[t]he notion that Triplecheck (the target defendant alleged to·be primarily responsible and actively negligent, and not sued in a vicarious capacity) was in a position to shift *all* of its liability to STSI (a mere franchisor with no on-site responsibility sued primarily in a vicarious capacity for the active negligence of Triple-

eminently clear to this Court that *even if* the risk of personal exposure that STSI has conjured up was an appreciable one, STSI has fallen far short of meeting the high "gross disregard" standard set forth in *Pavia*; it has utterly failed to show that St. Paul "engaged in a pattern of behavior evincing conscious or knowing indifference" to that risk. *See Stuckey v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 131 F.Supp.3d 73, 86–87 (S.D.N.Y. 2015) ("As a threshold matter, it is not even clear that a bad faith argument can proceed absent a concrete risk of personal exposure to the insured … In any event, there is no 'pattern of behavior' here suggesting that [the insurer] was indifferent to the possibility that [the insured] would be personally liable for a large judgment."). Despite having submitted 1800-plus pages of record evidence to this Court, and despite its constant refrain in its papers and at oral argument that the "totality" of this record shows gross disregard, STSI has not point-

ed to a *single* document or testimonial excerpt showing that there was any appreciable risk of personal liability to STSI in the event of unilateral settlement, let alone that St. Paul recognized such a risk and chose to disregard it.[14]

To the contrary, the record shows that St. Paul repeatedly attempted to ensure that any unilateral settlement that STSI entered into with Fernandez would release *all* claims against STSI, and not just the direct liability claims. And a June 2008 letter reveals that when Stein raised concerns about the possibility of a Triplecheck cross-claim for "failure to train" in the event of a unilateral settlement, the Anderson Firm considered the issue and opined that General Maritime Law would bar Triplecheck from later seeking contribution from STSI. (Dkt. 237–76, Pl.'s Ex. 73.) Even if the Anderson Firm's legal analysis on this score were incorrect (and

---

check) is beyond speculative; it is utterly farfetched and finds no support in the record." (Dkt. 252 at ECF 4 (emphasis added).)

**14.** At oral argument, STSI co-counsel Bradley Slenn stated, for instance: "[W]e would submit that the total of this record demonstrates plenty of facts that combined show clear disregard and gross disregard" and advised the Court that it was "looking at a summary judgment motion that has over, what, three hundred exhibits. That's because there is plenty of factual evidence in here to demonstrate gross disregard." (Oral Arg. Tr. 89:6-9; 89:10-13.) This Court thereupon solicited an additional letter from STSI identifying *specific* instances in which either STSI advised St. Paul of the personal liability risks of a unilateral settlement along with St. Paul's responses, or in which St. Paul otherwise discussed or evaluated such a risk. STSI submitted such a letter on July 8, 2016, which, as St. Paul points out, went well beyond the Court's direction and is "the equivalent of a twenty page double-spaced sur-reply," (Dkt. 252 at ECF 1).

Yet STSI's submission spectacularly failed to accomplish the task at hand. The Court finds that none of the instances cited by STSI

in its July 8 letter show that St. Paul "engaged in a pattern of behavior evincing conscious or knowing indifference" to a probability of personal exposure. For example, STSI cites to evidence of: (1) St. Paul's and Anderson's consideration of the potential of a direct liability claim against STSI in September 2007; (2) an April 18, 2008 exchange in which Anderson advised St. Paul that *STSI* would retain its right to indemnification *against Triplecheck* after unilateral settlement; (3) an August 2008 exchange in which Anderson opined that a jury verdict "will almost certainly be devastating" to STSI and therefore urging unilateral settlement; and (4) an October 2008 exchange between Anderson and McIntyre where STSI contends that Anderson "addressed unilateral settlement of STSI with Fernandez as in the best interest of STSI without ever considering Triplecheck's potential claim against STSI." (*See* Dkt. 250.) None of this correspondence demonstrates gross disregard of a risk of personal liability; if anything, it demonstrates St. Paul's attempt to avert such a risk by settling STSI out.

this Court makes no determination either way), such negligence in legal analysis does not rise to the level of bad faith. *See Pinto*, 221 F.3d at 399 ("The duty to act in good faith is not breached by an insurer's conduct that amounts to a mistake in judgment or negligence." (citing *Pavia*, 82 N.Y.2d at 453, 605 N.Y.S.2d 208, 626 N.E.2d 24)).

STSI also devotes its energies in its opposition and supplemental July 8 letter to pointing out the *absence* of any evidence that St. Paul ever considered the risk of a devastating Triplecheck cross-claim following unilateral settlement. (*See* Dkt. 250 at ECF 5.) But the absence of evidence just as well could mean the risk was *so* negligible and *so* speculative that no *reasonable* person would take it into account; it simply cannot carry the day at summary judgment. Here, the *only* person to raise the specter of some supposedly catastrophic indemnification claim that might be asserted against STSI by Triplecheck after unilateral settlement was Stein,[15] and St. Paul, the Anderson Firm, and Milliken reassured him his concerns were unwarranted. Although STSI insists that the magnitude and likelihood of the catastrophic risk advanced by Stein and allegedly dismissed by St. Paul should be put to the jury, the Court strongly disagrees. To adopt such a view would be to permit a jury to routinely second-guess the legal and business decisions of insurers and insurer-appointed counsel, in the absence of *any* evidence that the insurer had, in fact, recognized a genuine risk to its insured and willfully ignored it. A case cannot proceed to trial based solely on the word of one Chicken Little proclaiming that "the sky is falling."[16]

At the end of the day, the situation here is no different from the one in *Feliberty*: St. Paul was well within its contractual rights to settle its sole insured out of the lawsuit within policy limits, without also trying to extricate Triplecheck—a party that it did not insure and owed no legal obligation to. And St. Paul was free to do so even if STSI would suffer significant backlash from its franchisees. Had STSI felt so strongly about the need for global settlement in joint franchisor-franchisee suits to preserve its "united front" and to ensure that it did not abandon a franchisee, then it should have paid for an insurance policy that required its consent to settlement. *See Feliberty*, 531 N.Y.S.2d 778, 527 N.E.2d at 262 (noting alternative of "bargained-for, and presumably costlier, policy provisions contemplating the insured's consent to settlement"); *Nike, Inc. v. KOS Trading Corp.*, No. 02-cv-3970, 2003 WL 83351, at *1 (S.D.N.Y. Jan. 9, 2003) ("While Defendants argue that the settlement entered into here is against

---

15. (*See, e.g.*, Dkt. 237–102, Pl.'s Ex. 97 (an October 2008 email from Stein to Anderson asking why "no consideration is remotely given to what, if any, claims [the unilateral settlement] would create in [Triplecheck] and RLI (for which there would then be no continuing insurance from St. Paul, right?)" and stating "[Triplecheck] and RLI would have virtually no ability to settle rendering an eventual jury trial and the consequences that you have proclaimed as terminal to Sea Tow certain and inevitable. WOULD YOU ENSURE SEA TOW AGAINST ANY NEGATIVE CONSEQUENCES TO THIS MOVE?"); Dkt. 237–109, Pl.'s Ex. 103 (another October 2008 email from Stein to McIntyre and Milliken asking, "Would not St. Paul's [unilateral settlement strategy] be an exposure of potential further liability between the carriers and between the parties?").)

16. The story of Chicken Little, known in other parts of the world as Henny Penny, is a children's folktale in which the titular protagonist, upon being struck by on the head by an acorn, jumps to the conclusion that the sky must be falling and sets out to convince other members of the animal kingdom of the impending calamity.

their interest, the insurance policy that they chose does not require their consent. Had that been important to Defendants, they could have chosen to pay for such a policy instead."). Having failed to bargain for such a provision, STSI cannot now override *St. Paul's* contractual right to settle—a clause for which St. Paul *did* bargain.[17]

Moreover, there is simply no indication that the "inherent conflict" between the insurer and insured with which the bad faith cases in New York are so concerned was at play here. For all of STSI's purported outrage at St. Paul's position on settlement and attempts to cast this disagreement as a "conflict," the Court finds

that STSI's and St. Paul's legal interests were actually aligned. As discussed above, New York courts have recognized that an insured's core interest is in resolving an action within policy limits, and St. Paul unwaveringly sought to achieve this result for STSI here. For all of the foregoing reasons, the Court finds that St. Paul's pursuit of unilateral settlement over STSI's wishes did not breach its duty of good faith.[18]

### 2. St. Paul's Coverage Dispute With RLI

■ STSI also argues that St. Paul breached the St. Paul MGL Policy by taking the position that *RLI* was the primary insurer for STSI in the *Fernandez* Action.

---

17. STSI fundamentally fails to grasp that an insurer has a legitimate interest in minimizing its own financial liability by minimizing its insured's liability. *See, e.g., M & M Elec., Inc. v. Commercial Union Ins. Co.*, 241 A.D.2d 58, 62–63, 670 N.Y.S.2d 909 (N.Y. App. Div. 1998) ("The insurer's right to control the defense of the underlying litigation against the insured corresponds to the recognized right of the insurer to protect its own financial interest."). Instead, STSI appears to view its insurance coverage under the St. Paul MGL Policy and RLI MGL Policy as two reserves of $1 million, to be tapped at STSI's discretion. When STSI protests that St. Paul should have agreed to remain in the *Fernandez* Action so that the $1 million policy limit of the RLI MGL Policy would remain available for STSI to draw upon for the purposes of achieving a global settlement, it is effectively volunteering to assume a greater share of the liability—to fund a greater share of the settlement using its comparatively greater insurance coverage—than it needed to. The Court is particularly troubled by evidence in the record that Stein actively tried to undermine St. Paul's interests in minimizing its financial liability by promising Dorta "good compensation" from St. Paul for a global settlement and pressing Dorta for "ammunition" STSI could use against St. Paul as a pressure point to contribute more. (*See* Dkt. 238–45, Def.'s Ex. 45 (Stein writing: "There are many ways to skin the cat, and neither you nor I could give a hoot which carrier pays").)

18. As a final note, the Court finds that its review of the record supports that St. Paul, in fact, thoroughly considered STSI's interests and sought to act in its best interests. For instance, in an August 2008 email to Frohnhoefer and McIntyre, Anderson wrote:

> [W]hile a global settlement of all claims against both [Triplecheck] and [STSI] is a very desirable goal and one toward which we should strive mightily, it is much more critical to the survival of [STSI] that the claims against [STSI] be settled without any adverse findings against [STSI] even if that means a separate settlement leaving [Triplecheck] and their recalcitrant insurance carrier to carry on alone. The apparent business benefit to [STSI] in its relationship with its other franchisees of being seen to maintain a united defensive front with [Triplecheck] and the potential adverse impact of being seen by the other franchisees as having abandoned [Triplecheck] if [STSI] settles *separately pale into insignificance when compared to the hugely adverse impact of the findings discussed above on the continued survival of the [STSI] franchise network*. Thus, if it comes down to it, we recommend, indeed we urge, that [STSI] be prepared to settle separately with Fernandez if we are unable to negotiate a global settlement at mediation.

(Dkt. 238–42, Def.'s Ex. 42 at ECF 3 (emphasis added).)

According to STSI, each time St. Paul pressed RLI to cover STSI's defense, it was "breach[ing] the [St. Paul MGL] policy by refusing to accept the cost of defense and depleting available insurance [*i.e.*, the RLI P&I Policy]" for Triplecheck. (STSI Opp'n at ECF 19.) The Court rejects this theory as well.

While a wrongful *disclaimer* of coverage could constitute bad faith, STSI does not point to a shred of evidence that St. Paul ever disclaimed coverage of STSI in the *Fernandez* Action. To the contrary, the undisputed record evidence shows that St. Paul readily assumed coverage of STSI in the *Fernandez* Action from the start and never wavered in its obligation to defend or indemnify STSI. Immediately after St. Paul was first notified of the vicarious liability claim asserted against STSI in the *Fernandez* Action, it confirmed coverage under the St. Paul MGL Policy in a letter dated June 7, 2007, subject to a reservation of rights both parties agree are not applicable here. (Def.'s 56.1 ¶¶ 17-18.) The letter further advised STSI that it was entitled to defense and indemnification under the RLI insurance policy as an additional insured, and that St. Paul would evaluate RLI's obligations to defend STSI under its policies. (*Id.* ¶¶ 19-20.) No one at STSI objected or expressed confusion at the time as to St. Paul's confirmation of coverage of the vicarious liability claim under the St. Paul MGL Policy or as to Anderson's role. (*Id.* ¶¶ 21, 22.) Nor did St. Paul waver in its coverage position after the direct liability claim was asserted against STSI. When RLI refused coverage of the direct liability claims in October 2007, St. Paul readily assumed responsibility for defending STSI through discovery while continuing to press its position on RLI. And when RLI refused to contribute the funds to settle STSI out on its own, St. Paul readily agreed to contribute the necessary funds to settle STSI out of the action, taking the position that it could seek indemnification from RLI later. (*See, e.g.*, Dkt. 237-70, Pl.'s Ex. 67.) Simply put, St. Paul's dispute over the order of coverage with RLI never came at STSI's expense.

STSI does not point to any case law suggesting that an insurer's investigation into or opining on the applicability of other sources of coverage could constitute a breach of its duty of good faith in the absence of some showing that the insurer refused to defend its insured as a result of its belief in the primary nature of another carrier's obligations. *Cf. Cont'l Cas. Co. v. Rapid–Am. Corp.*, 80 N.Y.2d 640, 593 N.Y.S.2d 966, 609 N.E.2d 506, 514 (1993) ("[T]he duty to defend is broader than the duty to pay, requiring each insurer to defend if there is an asserted occurrence covered by its policy ... and *the insured should not be denied initial recourse to a carrier merely because another carrier may also be responsible.*" (emphasis added) (citations omitted)). Nor does STSI point to any express contractual provision breached by St. Paul. Indeed, attempting to enforce and exhaust all "additional insured" coverage to which STSI was entitled under the RLI policies arguably falls squarely *within* St. Paul's express contractual right to enforce "any right of contribution or indemnity against any person or organization who may be liable to [STSI]" and corresponding right to seek STSI's assistance with the same. (*See* SP MGL § I(12)(3).)

Moreover, just as the Court found above that St. Paul acted in line with STSI's legally relevant interests in pursuing unilateral settlement, it finds that St. Paul and STSI's interests were also aligned here. As St. Paul points out, its position of shifting primary coverage of the *Fernandez* Action onto RLI would have preserved STSI's aggregate policy limits under the

St. Paul MGL Policy for another day and avoided (or lessened) the impact of the *Fernandez* Action on STSI's future premiums. (Dkt. 240 ("MSJ Br.") at ECF 18.) Indeed, this is likely why STSI's own Franchise Agreement required franchisees to procure primary additional insured coverage for STSI in Article 9.16. *See also BP Air Conditioning Corp. v. One Beacon Ins. Grp.*, 33 A.D.3d 116, 124, 821 N.Y.S.2d 1 (N.Y. App. Div. 2006) ("One of the reasons additional insured status is sought is to avoid the necessity for the [additional insured] to use its own policy. If the [additional insured] is forced to have its own insurance defend a suit, the very purpose underlying additional insured status has been thwarted." (citation omitted)). STSI's stated concern that pressing costs onto RLI would deplete the pool of insurance available to extricate *Triplecheck*—who is not insured by STSI—is simply not a legally relevant interest. Accordingly, the Court concludes that St. Paul also did not breach any duty of good faith by pressing RLI for coverage of STSI under its policies.[19]

### 3. Conflicted Counsel

■ The Court similarly rejects STSI's argument that because the Anderson Firm and Andrew Anderson were "conflicted," in that they also advised St. Paul on RLI's coverage obligations and settlement strategy, STSI was entitled to independent counsel at St. Paul's expense. Specifically, STSI takes the position that *Stein* acted as its "true" counsel all along and that the $250,000 in fees that he incurred in the *Fernandez* Action should therefore be reimbursed by St. Paul.[20]

■ The New York Court of Appeals has held that when a conflict of interest exists between the insurer and the insured, then the obligation to defend includes an obligation to pay reasonable attorneys' fees for independent counsel for the insured. *See Pub. Serv. Mut. Ins. Co. v. Goldfarb*, 53 N.Y.2d 392, 442 N.Y.S.2d 422,425 N.E.2d 810, 815 (1981). However, independent counsel "is only necessary in cases where the defense attorney's duty to the insured would require that he defeat liability on any ground and his duty to the

---

19. Another common theme in STSI's papers is its insistence that St. Paul's conduct "can only be explained as a desire to punish RLI, as a threat in the market sector ... using Sea Tow as a pawn." (Frohnhoefer Decl. ¶ 14.) Although St. Paul's *motive* for pressing RLI would not matter in any event, the Court notes as an aside that STSI's motive theory is undermined by an affidavit from RLI's President of its Ocean Marine Division, who states: "I have been informed that STSI is claiming that ... an objective of St. Paul in connection with its handling of the Fernandez matter was to drive RLI from this market; RLI does not have any knowledge or information, and is not of the belief, that this is true." (Dkt. 236, Aff. of Robert Schauer ¶ 5.)

20. The Court observes that the fees and costs for Stein's work are the most concrete of the damages claimed by STSI, which otherwise suffered no out-of-pocket loss from the settlement. STSI's other alleged injuries include an alleged increase in premiums and loss in Tri-

plecheck's value due to "[St. Paul's] dragging out the case and refusing to settle globally, harming STSI's goodwill within the [Sea Tow network] thus devaluing the franchise." (STSI Opp'n at ECF 35-36.) The Court notes here that it does not adopt St. Paul's argument that a bad faith claim for failure to settle can *never* survive where the insurer ultimately settled within policy limits, which would certainly be the simpler ground on which to dismiss STSI's claims. While St. Paul may ultimately be correct, the Court observes that the New York Court of Appeals chose not to adopt that portion of the lower court's holding in *Feliberty*. Moreover, the Court could conceive of a hypothetical scenario where, even though a settlement is ultimately achieved within policy limits, the path to settlement was so rife with improper conflicts between the insurer and insured that some bad faith claim may nevertheless be cognizable. However, it declines to opine on this unsettled issue and rests its ruling on the many other reasons provided above.

insurer would require that he defeat liability only upon grounds which would render the insurer liable."[21] *Id.* n.1; *see also Prashker v. United States Guar. Co.*, 1 N.Y.2d 584, 154 N.Y.S.2d 910, 136 N.E.2d 871, 876 (1956); *Exec. Risk Indem. Inc. v. Icon Title Agency, LLC*, 739 F.Supp.2d 446, 450 (S.D.N.Y. 2010). Here, there was no such conflict: it is undisputed that St. Paul accepted coverage of both the vicarious liability and direct liability claims asserted against STSI at all times. Even though its position was that RLI's coverage was primary, St. Paul continued to have a vested interest in defending STSI from both of these claims because St. Paul, and not STSI, would be stuck with the defense costs in the event RLI later prevailed with respect to its coverage position. Given that the type of conflict identified in *Public Services Mutual* is not present here, the Court concludes that STSI was not entitled to independent counsel.

## C. TORTIOUS INTERFERENCE (COUNT THREE)

■ Liberally construed, STSI avers that St. Paul caused STSI to breach four agreements: (1) the Franchise Agreement, (2) the RLI MGL Policy, (3) the Statement of Insured's Rights, and (4) the JDA.[22] (STSI Opp'n at ECF 29-30.) "Under New York law, the elements of tortious interference with contract are (1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'" *CAC Grp. Inc. v. Maxim Grp. LLC*, 523 Fed.Appx. 802, 806 (2d Cir. 2013) (citing *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996)).[23] Because the Court finds that the undisputed facts show that the foregoing agreements were not breached—and that some were not even contracts at all—this claim must be dismissed.[24]

■ *Franchise Agreement.* STSI argues that St. Paul's attempt to achieve a

21. The Court rejects STSI's reliance on *Elacqua v. Physicians' Reciprocal Insurers*, 52 A.D.3d 886, 887, 860 N.Y.S.2d 229 (3d Dep't 2008) and *Rimar v. Cont'l Cas. Co.*, 50 A.D.2d 169, 173, 376 N.Y.S.2d 309 (1975), both of which involved the type of conflict recognized in Goldfarb, which does not exist here.

22. The SAC alleges simply that "St. Paul's conduct constituted direct and deliberate interference, tortiously and intentionally, with STSI's contracts with its franchisee, RLI, and its counsel, for which STSI suffers injury in an amount undetermined but believed to exceed the sum of $1,000,000.00." (SAC ¶ 66.)

23. "Where the laws at issue are not in actual conflict, the court applies New York law." *Deykina v. Chattin*, No. 12–cv–2678, 2014 WL 4628692, at *3 (E.D.N.Y. Sept. 15, 2014) (citing *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998) ("It is only when it can be said that

there is no actual conflict that New York will dispense with a choice of law analysis."); *Simon v. Philip Morris Inc.*, 124 F.Supp.2d 46, 71 (E.D.N.Y. 2000) ("A court is free to bypass the choice of law analysis and apply New York law in the absence of a material conflict.")). The Court has determined that there is no material conflict between New York and Florida law with respect to tortious interference, and thus will apply New York law. (*See* STSI Opp'n at ECF 29 n.27 ("To set forth a claim for tortious interference under Florida law, STSI must show: (1) existence of the contract, (2) [St. Paul's] knowledge that there exists such contract, (3) [St. Paul's] intentional procurement of the breach, (4) lack of justification and (5) damages resulting for STSI.") (citing *Gamel v. Manesiotis*, 526 So.2d 86, 87 (Fla. Dist. Ct. App. 1987)).

24. St. Paul argues that a tortious interference claim can only lie if the claim is that St. Paul

unilateral settlement and its "personal threats" to STSI to keep those efforts quiet from Triplecheck caused STSI to breach an unspecified provision of the Franchise Agreement, which STSI contends required it to keep Triplecheck informed of settlement discussions. (STSI Opp'n at ECF 29.) The "personal threat" in question apparently refers to St. Paul's letter to STSI dated October 10, 2008, stating as follows: "Should you not comply with this requirement to not communicate [the proposed unilateral] settlement details to any third party including [Triplecheck], we hereby give you notice that we would view this as a breach of your duty to cooperate . . . and accordingly, we hereby reserve our rights under the policy, in the event of such a breach." (Dkt. 237–105, Pl.'s Ex. 100.) At oral argument and in its July 8, 2016 letter, STSI appears to identify Article 12.3.1 as the provision alleged to have been breached. (*See* Oral Arg. Tr. 66; Dkt. 250 at ECF 1.) That provision states that STSI "*may elect to assume . . . the defense and/or settlement of any . . .*" action [arising out of Triplecheck's acts, errors, or omissions], provided that [STSI] will seek the advice and counsel of [Triplecheck] and shall keep [Triplecheck] in-

formed with regard to any such proposed or contemplated settlement(s)." (FA § 12.3.1 (emphasis added).)

Notwithstanding STSI's revisionist account that it assumed Triplecheck's defense and settlement "early on in the *Fernandez* case" under Article 12.3.1, (*see* Dkt. 250 at ECF 1), there is no record evidence that Article 12.3.1 was ever invoked here; to the contrary, the Court finds that the record clearly shows that *RLI* at all times handled Triplecheck's defense. Thus, there was simply no breach of Article 12.3.1. *Even if* STSI had assumed Triplecheck's defense under Article 12.3.1, however, the Court finds that this claim would still fail because St. Paul's actions were entirely justified under its own contract. *See Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of New York, Inc.*, 968 F.2d 286, 292 (2d Cir. 1992) (setting forth factors to consider to determine whether interference was "without reasonable justification" or was "improper") (citing *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 189–90, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980)). As discussed above, the St. Paul MGL Policy gave St. Paul complete control over

had caused *Triplecheck* or *RLI* to breach the contracts to which STSI is a party. (*See* Dkt. 243 at ECF 14 (citing *Jack L. Inselman & Co., Inc. v. FNB Financial Co.*, 41 N.Y.2d 1078, 1080, 396 N.Y.S.2d 347, 364 N.E.2d 1119 (1977)). The Court is unconvinced. The Court notes that at least one court has observed that "those few New York state courts to have considered the issue have held that causing a plaintiff to breach a contract by preventing the plaintiff's [own] performance constitutes tortious interference with a contract, provided that the other elements of the tort are satisfied." *Italverde Trading, Inc. v. Four Bills of Lading*, 485 F.Supp.2d 187, 203 (E.D.N.Y. 2007) (citing *Stiso v. Inserra Supermarkets, Inc.*, 179 A.D.2d 878, 880, 578 N.Y.S.2d 680 (N.Y. App. Div. 1992) (defendant's exclusion of plaintiff-sales representative from its stores constituted tortious interference with plain-

tiff's exclusive distribution contract with distributor)); *Morris v. Blume*, 55 N.Y.S.2d 196, 199 (Sup. Ct. 1945) (holding that "[a]n unlawful interference with a person in the performance of his contract with a third party is just as much a legal wrong as is an unlawful inducement of a breach of contract by the third party"). The court in *Italverde* also observed that the *Jack L. Inselman* case on which St. Paul relies here did not "confront[ ] . . . the question of whether a tortious interference claim would lie in a case where the defendant's conduct had caused the plaintiff to breach the contract." 485 F.Supp.2d at 202. As the Court finds it clear that no breaches even occurred, and in light of the unsettled law with respect to the ground that St. Paul advances as the basis for dismissal, the Court will not dismiss this claim on that basis.

settlement and further provided that STSI "shall not, except at [its] own cost, voluntarily ... assume any obligation" in the event of suit. (SP MGL § I(12)(3).) St. Paul's rights thus trump STSI's right to invoke Article 12.3.1; had STSI wished to preserve that right, it should have bargained for a different policy.

■ *RLI MGL Policy.* STSI next argues that St. Paul caused it to breach some unspecified duty of cooperation under the RLI MGL Policy because of the same conduct as above. As best as the Court can tell, STSI appears to be referring to section N(3)(c) of the RLI MGL Policy, which provides that "[Triplecheck] and any other involved insured must ... [c]ooperate with us in the investigation or settlement" of a suit. (*See* STSI Opp'n at ECF 10 (citing "cooperation clause at [page 9 of RLI MGL Policy exhibit]").) The Court rejects this basis for a tortious interference claim as well. Setting aside the fact that STSI was not even a party to the RLI MGL Policy, there was no breach of the RLI Policy because it is undisputed that RLI had taken the position that its policies did not cover STSI at the time of the settlement negotiations in question; rather, it had expressly tendered STSI's defense to St. Paul by that time. (*See* Def.'s 56.1 ¶ 33.)

■ *Joint Defense Agreement.* The JDA refers to a purported agreement between STSI and Triplecheck to defend the *Fernandez* Action together and seek global settlement. (Pl.'s 56.1 Opp. ¶ 1.) STSI admits that "there is no document specifically named 'Joint Defense Agreement,'" (STSI Opp'n at ECF 8 n.4), but argues that its existence is "evident" from a May 10, 2007 letter—in which the parties tentatively agreed to joint representation in the

*Fernandez* Action by an RLI-appointed attorney until a conflict were to materialize [25]—and the fact that STSI and Triplecheck did not assert cross-claims against each other even though they could have under the Franchise Agreement. This does not come close to satisfying the basic definition of a contract. In any case, *even if* STSI could somehow establish the existence of a contract binding STSI and Triplecheck to a joint defense, St. Paul's exercise of its rights under the MGL Policy would provide justification for interference with that contract, as the Court has already explained above.

■ *Statement of Insured Client's Rights.* Finally, STSI contends that St. Paul, "in employing, directing and controlling STSI's defense, in a terminal conflict of interest, caused [the Anderson Firm] to breach ... the Statement of Insured Rights." (STSI Opp'n at ECF 30; Dkt. 237–53, Pl.'s Ex. 50.) The Statement of Insured Client's Rights, however, is also not a contract. Rather, it is a required disclosure of an insured's rights concerning insurer-appointed defense counsel. *See* Fla. Bar. R. 4–1.8(j). Indeed, the Florida rule specifically provides that no matter "set forth in the Statement of Insured Client's Rights give rise to an independent cause of action." *Id.*

Accordingly, the Court dismisses STSI's claim for tortious interference of contract.

## D. UNFAIR AND DECEPTIVE PRACTICES (COUNT TWO)

Although STSI does not specify which State's unfair and deceptive practices statute it brings this claim under in the SAC, STSI focuses on New York General Business Law § 349 ("Section 349") in its opposition brief. Section 349 bars "[d]eceptive

---

**25.** As this Court discussed in *supra* footnote 4, STSI's interpretation of the May 10, 2007 letter finds no support in either the language or context of the letter.

acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349. STSI premises its Section 349 claim on St. Paul's failure to advise STSI of its right to independent counsel. (STSI Opp'n at ECF 28.) As this Court found above that STSI did not, in fact, have a right to independent counsel at St. Paul's expense, this claim must fail.[26]

## E. OTHER CAUSES OF ACTION

The SAC asserts three other causes of action—legal malpractice, defamation, and conspiracy—which, on their face, were directed against previously-dismissed defendants the Anderson Firm and Andrew Anderson ("Anderson Defendants") only. This Court had previously assumed these causes of action to be dismissed once the Anderson Defendants were dismissed for lack of personal jurisdiction in April 2011.[27] (*See* Dkt. 34 at ECF 4.) In its opposition brief now, however, STSI maintains that these claims are asserted against St. Paul as well, and therefore, remain in the case. The Court considers these claims and finds that they are woefully deficient.

### 1. Legal Malpractice (Count Four)

STSI's legal malpractice claim is based on a vague allegation that the Anderson Defendants breached their duty to "zealously represent STSI's interest, and not the interest of any other party or entity, or in any manner in conflict," resulting in injury to STSI "believed to ex-

ceed the sum of $1,000,000.00." (SAC ¶¶ 68, 69.) This claim must fail in light of the Court's finding above that the Anderson Firm's actions challenged by STSI—its evaluation of RLI's coverage and recommendation of unilateral settlement—did not render it conflicted from a legal perspective. That same conduct cannot now support a legal malpractice claim.

Aside from the "conflict," STSI identifies one other instance as the basis for legal malpractice in its opposition. STSI contends that Anderson, in the *Fernandez* litigation, improperly sought to "fix" the outcome of a motion for summary judgment by agreeing with Fernandez's attorney, Dorta, that if they reached a unilateral settlement, Dorta would "roll over" with respect to Fernandez's direct liability claim against STSI and effectively allow the claim to be dismissed on summary judgment. (STSI Opp'n at ECF 33.) Anderson evidently believed that obtaining a court ruling dismissing Fernandez's direct liability claim against STSI would improve St. Paul's ability to later recover the full amount of any unilateral settlement from RLI, as that settlement amount would represent a payment to settle the vicarious liability claim only. While the Court is somewhat troubled by Anderson's suggestion to use the judicial system in this manner, the scenario never came to pass and therefore resulted in no damages to STSI.

---

26. STSI makes two other cursory arguments: first, that St. Paul's interference with the Franchise Agreement was misleading conduct that affected the entire Sea Tow network, and second, that St. Paul's "underlying tortious conduct support[s] a [Section 349 claim]." (STSI Opp'n at ECF 28.) The Court rejects the former for the same reasons it rejected STSI's tortious interference with contract claim that was premised on the Franchise Agreement;

the Court rejects the latter assertion as much too vague to even consider.

27. The Court notes that STSI never opposed the Anderson Defendants' motion to dismiss for a lack of personal jurisdiction, despite requesting two extensions of time to file an opposition. Moreover, following the dismissal of the Anderson Defendants, STSI never sought to re-file the claims against them in Florida or anywhere else.

▇ Even if STSI were claiming some other type of negligence on the Anderson Firm's part—which has not appeared in any of STSI's submissions to date and is far too late to raise at any rate—it is well-established that an insurer may not be held vicariously liable for legal malpractice on the part of counsel it has retained to defend an insured. *See Feliberty*, 531 N.Y.S.2d 778, 527 N.E.2d at 265 ("[G]iven the insurer's inability to provide or control the legal services in issue, and the existence of a remedy for incompetence against counsel . . . the imposition of vicarious liability in the circumstances is unwarranted"). Finally, STSI cannot establish any losses or actual damages as a result of any attorney negligence in light of the settlement within policy limits. *See Brooks v. Lewin*, 21 A.D.3d 731, 734, 800 N.Y.S.2d 695 (N.Y. App. Div. 2005) (an action for legal malpractice requires proof of three elements: "(1) that the attorney was negligent; (2) that such negligence was a proximate cause of plaintiff's losses; and (3) proof of actual damages.") STSI simply points to nothing in the record supporting the notion that STSI suffered any harm due to the manner in which the Anderson Firm defended STSI. Accordingly, the Court dismisses STSI's legal malpractice claim.

### 2. Defamation (Count Five)

▇ STSI also asserts a defamation claim for statements made by Anderson in an October 7, 2008 email addressed to four individuals: Larry Jacobson and Mark Houck at the Anderson Firm, and Janice McIntyre and Pearl Gray of St. Paul. STSI identifies the following four statements as defamatory: (1) "the consequences of Mitch Stein's outrageous, rude, disruptive and unprofessional conduct at the deposition of Frohnhoefer in New York continue to ripple through out [*sic*] this case"; (2) "[i]n my opinion, Stein is emotionally and mentally unstable and solely concerned with the relationship between [Triplecheck], [STSI], and the appearance of the resolution of this case to other franchisees"; (3) "[i]n my view, we can NOT trust [Stein] not to reveal all to [Triplecheck]"; and (4) "I believe [Stein] will violate any confidence we give him. I would not put it past him to try to destroy [St. Paul's] subrogation rights against [Triplecheck] by having Frohnhoefer sign a release of the indemnity claim against [Triplecheck] so we have to keep that in mind as well." (Dkt. 237–93; SAC ¶ 71.)

▇ The Court concludes that this claim is barred by the New York one-year statute of limitations for defamation actions under C.P.L.R. § 215(3). "Where jurisdiction rests upon diversity of citizenship, a federal court sitting in New York must apply the New York choice-of-law rules and statutes of limitations." *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998); *see also id.* at 627 (unless the New York borrowing statute for non-resident plaintiffs applies, "New York courts generally apply New York's statutes of limitations, even when the injury giving rise to the action occurred outside New York."). Here, the publication in question occurred on October 7, 2008, and STSI first asserted a defamation cause of action on July 28, 2010—nearly two years later. Because the Court finds that New York's one-year statute of limitations bars this claim, the Court need not address St. Paul's other arguments.[28]

---

**28.** St. Paul also contends that STSI lacks standing to sue for alleged defamatory statements made against Stein and that the statements are absolutely privileged as statements made in the course of a "judicial proceeding." (MSJ Br. at ECF 31-32.) Separately, the Court finds it likely that some, if not all, of the statements in question are statements of opin-

### 3. Conspiracy (Count Six)

Finally, STSI vaguely alleges that St. Paul engaged in a conspiracy with the Anderson Defendants. (SAC ¶¶ 77-78.) Neither Florida nor New York recognizes an independent cause of action for civil conspiracy where there is no underlying tort. *See Berwick v. New World Network Int'l, Ltd.*, No. 06-cv-2641, 2007 WL 949767, at *6 (S.D.N.Y. Mar. 28, 2007) ("New York also does not recognize civil conspiracy as an independent tort; such a claim 'stands or falls with the underlying tort.' "); *Alhassid v. Bank of Am., N.A.*, 60 F.Supp.3d 1302, 1316 (S.D. Fla. 2014) ("Florida [does not] recognize[ ] an independent cause of action for civil conspiracy; rather, the plaintiff must allege an underlying illegal act or tort on which conspiracy is based.") (collecting cases). Because no actionable tort remains, the Court dismisses STSI's conspiracy claim.

### CONCLUSION

For all the foregoing reasons, the Court GRANTS St. Paul's motion for summary judgment in its entirety and DISMISSES this action. The Clerk of Court is respectfully directed to enter judgment accordingly.

SO ORDERED.

---

ion that are not "capable of being proven false," and therefore, not actionable. *See Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 152–53, 603 N.Y.S.2d 813, 623 N.E.2d 1163 (1993) ("Since falsity is a necessary element of a defamation cause of action and only 'facts' are capable of being proven false, it follows that only statements alleging facts can properly be the subject of a defamation action." (internal citation and quotation marks omitted)). However, because neither party raised or briefed this argument, the Court will not make such a determination.